Estate of Bernon S. Prentice, Deceased, Ranald H. Macdonald and The New York Trust Company, Executors v. Commissioner.
Estate of Prentice v. Commissioner
Docket No. 44366.
United States Tax Court
T.C. Memo 1956-3; 1956 Tax Ct. Memo LEXIS 295; 15 T.C.M. (CCH) 14; T.C.M. (RIA) 56003; January 10, 1956
*295 Estate tax: Gross estate: Value of stock. - Fair market value of a block of stock of Fulton Trust Company of New York on the optional valuation date held to be not in excess of the value at which it was reported in the estate tax return. Francis J. Rogers, Esq., for the petitioners. Stanley W. Herzfeld, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: This is an estate tax proceeding in which the respondent has determined a deficiency in the amount of $589.275.32. The only adjustment made by the respondent that is placed in issue is the value of a block of stock of Fulton Trust Company of New York that was owned by the decedent. The executors reported the stock at a value of $147 per share at the optional valuation date. The respondent determined that its value was $250 per share. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner's decedent, Bernon S. Prentice, died testate on June 12, 1948, a resident of New Jersey. Ranald H. Macdonald and the Fulton Trust Company of New York, were named as executors and duly qualified and were appointed. Subsequently The New York *296 Trust Company succeeded the Fulton Trust Company as one of the executors. The executors timely filed a Federal estate tax return with the collector of internal revenue at Camden, New Jersey, and therein elected an optional valuation date for determining the value of the estate. Pursuant to that election, the valuation date for the stock of Fulton Trust Company of New York that was owned by the decedent at the time of his death is June 12, 1949. Among the assets of the estate were 3,857 shares of stock of Fulton Trust Company which were owned by the decedent at the date of death and were in the executors' hands on June 12, 1949. On March 13, 1947, the date on which the decedent executed his will, he owned about the same number of shares of stock of Fulton Trust Company that he owned at the date of death. His will contained the following provision: "Among the assets of my estate there will be a substantial block of the stock of Fulton Trust Company of New York of which I have been a director for many years. By the foregoing terms of my Will I have given uy Executors or Trustees the power to hold temporarily or permanently my estate as they may receive it and I desire to state *297 specifically that it is my intention that my Executors or Trustees should hold said Fulton Trust Company stock so long as they shall deem it advisable, irrespective of the fluctuation in market value and until such time as they can obtain a price for it which they shall deem commensurate with its value from the standpoint of its relation to the total amount of stock of that company outstanding. Because of the size of the block of stock which I now own I have in mind the value of it upon the basis of the control of the Trust Company inherent in its ownership by my Executors or Trustees or others and that accordingly it has a higher potential value than ordinary market quotations would indicate. * * *" Fulton Trust Company of New York, hereinafter called Fulton Trust, was a New York banking corporation, with its principal office at 149 Broadway, New York City. At all times relevant to this proceeding it had a branch office at 1002 Madison Avenue, New York City. It had outstanding 20,000 shares of capital stock. There were no other or different classes of stock authorized or outstanding. The valuation date, June 12, 1949, fell on Sunday. There was no trading in the stock markets in *298 New York on the preceding day. Friday, June 10, 1949, and Monday, June 13, 1949, were the nearest dates on which the markets were open for trading. The resources and liabilities of Fulton Trust by major categories at December 31, of each of the years 1945 to 1948, and at June 30, 1949, were as follows: Resources
Dec. 31, 1945
Dec. 31, 1946
Dec. 31, 1947
Cash [1]
$ 7,852,480.74
$10,610,612.54
$ 9,494,373.93
U.S. Gov't Securities
32,660,868.53
29,709,785.90
24,498,463.26
State and Municipal Secu-
rities
471,656.98
382,868.30
788,167.31
Federal Reserve Bank
Stock
120,000.00
120,000.00
120,000.00
Other Securities
799,505.19
1,703,229.48
3,219,793.89
Collateral Loans
1,795,130.00
1,022,693.00
1,265,361.02
Loans & Bills Purchased
572,032.51
Loans & Bills Receivable
Loans & Discounts
Overdrafts
5,414.00
9,430.00
9,240.93
Real Estate Bonds &
Mortgages
292,382.10
218,383.80
94,293.14
Real Estate (Branch
Office)
75,000.00
75,000.00
50,000.00
Other Resources [2]
139,367.10
142,840.51
132,007.86
Total
$44,211,804.64
$43,994,843.53
$40,243,733.85
Liabilities
Due Depositors
$38,621,840.91
$38,326,928.28
$34,546,273.79
Dividend Payable
30,000.00
30,000.00
30,000.00
Other Liabilities
Reserves [3]
315,195.17
320,995.38
309,989.29
Capital
2,000,000.00
2,000,000.00
2,000,000.00
Surplus
2,000,000.00
2,000,000.00
2,000,000.00
Undivided Profits
1,244,768.56
1,316,919.87
1,357,470.77
Total
$44,211,804.64
$43,994,843.53
$40,243,733.85
*299 Resources
Dec. 31, 1948
June 30, 1949
Cash [1]
$10,641,206.49
$ 8,320,073.20
U.S. Gov't Securities
19,672,628.97
16,205,853.37
State and Municipal Secu-
rities
4,308,312.77
4,455,538.98
Federal Reserve Bank
Stock
120,000.00
120,000.00
Other Securities
3,357,197.87
4,563,286.18
Collateral Loans
1,308,223.11
Loans & Bills Purchased
Loans & Bills Receivable
727,415.41
Loans & Discounts
2,277,071.63
Overdrafts
11,656.65
Real Estate Bonds &
Mortgages
81,736.53
Real Estate (Branch
Office)
50,000.00
50,000.00
Other Resources [2]
168,757.31
154,561.28
Total
$40,435,478.46
$36,158,041.29
Liabilities
Due Depositors
$34,720,062.47
$30,426,270.65
Dividend Payable
30,000.00
30,000.00
Other Liabilities
101,781.55
Reserves [3]
309,530.41
208,894.73
Capital
2,000,000.00
2,000,000.00
Surplus
2,000,000.00
2,000,000.00
Undivided Profits
1,375,885.58
1,391,094.36
Total
$40,435,478.46
$36,158,041.29
In each of the years 1945 through 1948, Fulton Trust paid dividends of $6 per share, a total of $120,000 *300 per year. For each of those years its net operating earnings (earnings after taxes and before dividends) and earnings per share were as follows: Net Operating
Earnings
Year
Earnings
Per Share
1945
$248,298
$12.41
1946
192,151
9.60
1947
160,551
8.03
1948
138,415
6.92
On June 13, 1949, the bid price on the over-the-counter market for Fulton Trust stock was $143 per share. The book value [1] on June 30, 1949, was $269.55 per share. Pertinent percentage data as to Fulton Trust and 13 other New York banks at the valuation date are as follows: Ratio of
Market
Market
Bid to
Yield to
Earnings to
Bid to
Book Value
Book Value [2]
Book Value [3]
Earnings
Fulton Trust
53.0
4.19
2.6
20.4
Average of 13 other banks
72.03
4.95
5.9
12.3
At June 30, 1949, the book values of capital stock, the market prices, and the percentage of discount of market prices from book values of Fulton Trust and 17 other New York banks were as follows: Book Value
Market
Discount
of Common
Price
from
Capital Stock
6/30/49
Book Value
Fulton Trust Company of New York
269.55
148
45.09
1. National City
52.86
38 3/4
26.7
2. Chase National
47.36
33 1/2
29.3
3. Guaranty Trust
370.30
262
29.2
4. Manufacturers Trust
62.79
47 1/4
24.7
5. Bankers Trust
55.30
38
31.3
6. Central Hanover
128.58
85 3/4
33.3
7. Chemical
46.50
39 3/8
15.3
8. Irving Trust
23.48
15 1/8
35.6
9. Bank of Manhattan
31.24
22
29.6
10. J. P. Morgan
301.97
223
26.2
11. First National
1413.26
1150
18.6
12. New York Trust
114.91
81
29.5
13. Corn Exchange
61.13
52 1/4
14.5
14. Public National
62.53
37 1/4
40.4
15. Commercial National
67.09
42 1/4
37.0
16. U.S. Trust
790.63
575
27.3
17. Brooklyn Trust
203.90
107
47.5
*301 At all material times the stocks of New York banks, including Fulton Trust until September 2, 1949, were traded as unlisted securities in the over-the-counter market. This is a market for the purchase and sale of securities maintained by a number of dealers and brokers who trade with each other and with other customers by use of telephones, private wires, and teletype machines. Quotations on stocks traded on this market appear in some daily newspapers. A central bureau issues daily quotation sheets which are furnished to subscribers and in which quotations on various stocks are given. Such quotations are the bid and asked prices furnished by the brokers and traders with respect to the particular stocks in which they are interested. The quotation of bid and asked prices (or the synonymous wants and offering prices) and the publication of such quotations does not necessarily mean that any sales in fact have taken place. The published quotations are consulted by dealers and brokers and used by them as a source of information in making actual trades and in formulating quotations, but no dealer is legally required to buy or sell at the price quoted by him to the central bureau and published *302 by it. Quotations on stock of Fulton Trust appeared in the daily quotation sheets on each day during the month of June 1949, except on Saturdays and Sundays. On five of the trading days in that month quotations were given by only one broker; on the other days there were quotations by two or more brokers. The low bid price in that month on Fulton Trust stock was $142, and the high was $146. The low asked price was $147, and the high was $151. On both June 10 and June 13, the quoted bid price was $143; on both of those dates one brokerage house quoted an asked price of $148 on 25 shares. On June 10 another brokerage house quoted an asked price of $150. Bid prices in July 1949 ranged from $142 on July 1 to $220 on July 29, and asked prices were at a low of $150 on July 1, and a high of $250 on July 27 and July 29. In the seven months' period, January to July 1949, three brokerage houses in New York in actual trading bought and sold a total of 1,460 shares of Fulton Trust stock. That figure is a net figure after eliminating sales between the brokers. Of that number, 662 shares were bought and sold in the first six months of 1949 and 798 shares were bought and sold in July. The sales *303 were in small lots of stock ranging from one share to sixty shares in the first six months. The prices at which the shares were actually bought and sold in the first six months of 1949 were: Low
$142
High
158 The actual transactions nearest in time before the valuation date were on May 19, 1949, when 20 shares changed hands at $146 and 40 shares changed hands at $148 1/2. The transaction nearest in time after the valuation date was on June 13, 1949, when 6 shares were traded at $143. In July 1949 shares were traded at prices ranging from $150 to $205 per share. The transactions in Fulton Trust Company stock in the first seven months of 1949 represented a normal and orderly market for that stock. It is quite usual in the over-the-counter market for stocks to be traded in less than 100 share lots. The market could not have absorbed a block of 3,857 shares of Fulton Trust stock in June 1949, at the prices then quoted for that stock. That number of shares could have been sold on the market only at a price per share less than the current market price per share. On September 2, 1949, Fulton Trust was merged into New York Trust Company pursuant to the Banking Law of *304 the State of New York. The agreement of merger was dated July 28, 1949. As a result of the merger, and in accordance with the terms of the merger agreement, the stockholders of Fulton Trust were paid $250 per share for their stock. At the valuation date, and for some time prior and subsequent thereto, the stocks of all New York banks were selling at prices considerably below their book values. The market prices were based on the yields and earnings of the shares rather than on their book values. In and prior to 1949 earnings of the smaller New York banks were declining due in part to rising costs of operation, declining interest rates, and increased reserves required by the Federal Reserve Bank. The earnings of Fulton Trust were decreasing partly because of its dependence on income from the administration of trusts. As the number of larger fortunes decreased so did income from the administration of trusts. Some banks increased their loan business in order to keep up earnings, but Fulton Trust did not do so. In 1949, and before and after that time, the low rate of earnings of New York banks, and the discount at which their stocks were selling in relation to book value, were motivating *305 causes for several bank mergers. The economics of bank mergers were such that upon a merger the stockholders of the absorbed bank would realize for their stock an amount more nearly equivalent to book value than to its lower market value. The facts as to the earnings, dividends, and book values of Fulton Trust and other banks were generally available to the public, to investors and to traders and brokers in the banks' published statements of condition. Market quotations on bank stocks were available through newspapers and other publications. Around the time of the valuation date there was considerable public discussion about the possibility of bank mergers. Between the early part of 1948 and the latter part of 1950, eight New York City banks were absorbed by others in mergers on terms that were profitable to the stockholders. Not all negotiations for mergers resulted in actual mergers. In at least two instances proposed mergers failed to materialize even after public announcements by bank officers of agreements to merge. Prior to the merger agreement between Fulton Trust and New York Trust Company, negotiations had been carried on in behalf of Fulton Trust with officers of other *306 banks in New York City. Conferences were held and communications exchanged with officers of J. P. Morgan & Co., Inc., between June 6 and 15, 1949. These negotiations ended on the latter date. Negotiations began in the latter part of 1948 with representatives of The New York Trust Company in which consideration was given to the sale of assets by Fulton Trust. Those negotiations failed and came to nothing in February 1949 because of the possibility that on a sale, some of the trust business might not go over to the acquiring bank. This would not have been true in a merger, but The New York Trust Company deemed it inadvisable to proceed upon the basis of a merger because of the then provisions of the New York Banking Law which would have permitted the stockholders of either institution to dissent, obtain an appraisal of their stock, and obtain payment of such appraised value. Under amendments to that law, effective April 18, 1949, only the stockholders of the bank being merged had the appraisal right. This change in the statute made possible the merger that subsequently occurred, but no negotiations concerning a merger between these two banks were then or for a considerable time thereafter *307 opened or discussed. The discussions as to the possible acquisition of Fulton Trust by The New York Trust Company in 1948 and early 1949 had been principally between the chairman of the board of Fulton Trust and a vice-president of New York Trust Company. The vice-president of New York Trust Company was out of the country from early May until June 20, 1949. During his absence there were no merger negotiations between any representatives of the two banks. Beginning June 21 there were talks between the chairman of the board of Fulton Trust and the vice-president of The New York Trust Company as to the possibility of merger; on July 6 and July 14, memoranda were written by them as to certain aspects of the proposed merger; on July 18 they orally agreed for the first time on the major points involved in the merger and on the price of $250 per share to be paid by The New York Trust Company for the stock of Fulton Trust. There had not been any meeting of minds or agreement on the terms of a merger between Fulton Trust and The New York Trust Company prior to July 18, 1949. On that date, July 18, 1949, when the major points basic to the merger were orally agreed upon, the agreement had *308 not been put in final form and had not been submitted either to the board of directors of Fulton Trust or to the Superintendent of Banks of the State of New York. On that date the chairman of the board of Fulton Trust had not discussed the merger negotiations with more than one or two of the directors. There were 15 members of the board in addition to the chairman and an honorary chairman. The written agreement of merger dated July 28, 1949, contained a provision that if the holders of five per cent or more of Fulton Trust stock voted in opposition to the merger and demanded payment for their stock, the agreement would become void at the option of The New York Trust Company. At the valuation date, June 12, 1949, there were no pending merger negotiations between Fulton Trust and The New York Trust Company, and there was no merger agreement or understanding between the banks as to any merger at that date. At the valuation date there was no public knowledge and there were no rumors as to any negotiations by representatives of Fulton Trust with any other bank concerning the liquidation or merger of Fulton Trust. On June 12, 1949, the fair market value of the 3,857 shares of stock *309 of Fulton Trust Company of New York held by the petitioner was $566,979, which is the value at a per share price of $147. Opinion This case requires that we determine the fair market value of a block of stock of Fulton Trust Company on June 12, 1949. The block of stock owned by the decedent at the date of death, and which continued to be owned by the estate at the optional valuation date, consisted of 3,857 shares. The total outstanding capital stock of Fulton Trust Company amounted to 20,000 shares. The decedent's stock was reported in the estate tax return as having a value of $147 per share. The petitioner stands on that figure. The respondent determined that the value was $250 per share; on brief he contends that the value on the valuation date was $200 per share. The evidence developed various factors, to some of which each party points as being favorable to its position. There are the over-the-counter sales, and quotations by traders, fairly near to the valuation date and only a few points above or below the figure at which the stock was reported for taxation. The petitioner says that these establish the value. The respondent argues that the sales were too few in number *310 and the lots sold were too small in size to establish the value of the petitioner's comparatively large block of the stock. The petitioner points out that Fulton Trust was a relatively small bank with only 20,000 shares of stock outstanding and that on those facts the amount of trading in the stock in the first seven months in 1949 reflected a normal and orderly market for the stock. The respondent further says that the market did not reflect the value because the buyers and sellers did not have knowledge of all of the relevant facts, which is an essential element in fixing fair market value. His argument on this point is directed to the fact that the tradeers on the market were not aware of past and current merger negotiations between Fulton Trust and other banks. Against this, the petitioner points out that on the valuation date the first negotiations with New York Trust Company had been terminated, that there were no further negotiations with New York Trust Company until after the valuation date, and discussions with another bank failed to produce a merger agreement and terminated on June 15, 1949. Further, the petitioner points out that in 1949 there were many stories and rumors *311 current as to the merger possibilities of various New York banks, and the facts that might be conducive to a merger in the case of Fulton Trust were available to the public. Among such facts were the declining earnings of Fulton, the high book value of its stock compared to the market price and that it was generally known that in bank mergers the stockholders obtained prices for their stock more nearly equal to book value than to market value. There is evidence that a block of stock of Fulton Trust of the size owned by the decedent could not have been sold at one time on the over-the-counter market at prevailing prices, and that the holder of such a block would probably be forced to take a lower price in order to dispose of it. On the other hand, there is testimony that such a block might bring a higher price than market, if a buyer could be found who wanted to acquire control of the bank. The respondent places particular emphasis on the provision of the decedent's will wherein he speaks of his block of Fulton Trust stock as having a higher potential value than is indicated by market quotations because of the control inherent in the ownership of the block. The petitioner points *312 out that the decedent's stock comprised only about 19 per cent of Fulton's outstanding stock and so it would not give mathematical control, and further that the disparity is even greater for merger purposes which requires affirmation by 66 2/3 per cent of the stock. The foregoing recitation points up some of the many factors that are often present in a stock valuation case where the parties earnestly endeavor to make a full presentation to assist in arriving at a figure which will be at least a fair approximation of fair market value at a given time. In the search for a solution to what constitutes fair market value, some helpful general principles have been laid down by this Court and others. The definition of the term has been stated to be the price which would probably be agreed upon by a seller willing, but under no compulsion, to sell, and a buyer willing, but under no compulsion, to buy, where both have reasonable knowledge of the facts. . Fair market value is a question of fact and all evidence bearing on it should be considered, *313 including any evidence to indicate that the fair market value may be affected by the size of the block of stock that is being valued. , affd. . Prices at which stock is bought and sold in the open market are generally the best evidence of value, , but if sales on the market are made under peculiar and unusual circumstances such as in small lots or in a restricted market they may not be evidence of the fair market value. . The existence of exceptional circumstances will not be presumed, but must be established before a determination based on public market prices will be disturbed. . With those principles in mind, a study of the evidence produced by both parties convinces us that on the valuation date the fair market value of the block of Fulton Trust stock held by the decedent's estate was not in excess of the figure at which it was reported in the estate tax return. The shares of Fulton Trust were *314 traded on the over-the-counter market in New York. That market, in addition to showing the actual sales of shares, furnished daily bid and asked prices. The testimony is that, considering the relatively small number of shares available, the market was a normal and orderly one for Fulton shares. In the month of June 1949, the bid prices for the stock were in the range of $142 to $146 and the asked prices were from $147 to $151. The actual sales on dates nearest in point of time to the valuation date were at prices from $143 to $148 1/2. We think that in the light of all the surrounding facts these figures constitute the best evidence of the fair market value of the stock at the valuation date. It is true that the quotations were given on relatively small lots and the sales were of small lots and rather widely spaced in point of time. However, the evidence is that the market as it then existed, and as it had been during all of the preceding months in 1949, could not have absorbed larger lots at the prevailing prices. It was the opinion of one of the witnesses that difficulty would have been encountered in disposing of a block as large as 100 shares. In his words, "It was not a 100 share *315 market. It was mainly a 10 or 20 share market all the time." The testimony as to the adequacy of the market prices for establishing the market value of Fulton Trust stock was given by men experienced in the analysis of facts and figures concerning bank stocks and fully conversant with market conditions for bank stocks. One is a statistician who specializes in insurance and bank stocks for a brokerage house that trades on the over-the-counter market, and another is the head of a brokerage firm that trades in bank and insurance stocks on that market. They were familiar with the pertinent facts as to the operations of Fulton Trust, including its earnings, and the yield of its shares. This information was also available to the buying public. The respondent contends that market prices at or about the basic date do not reflect fair market value because the buyers and sellers were uninformed as to the merger negotiations. The requirement of reasonable knowledge of the facts in the definition of fair market value is not a requirement that the public have knowledge of all facts concerning the corporation. *316 The Court pointed out in , that in a wide market with many buyers and sellers, the public often does not know the more important facts about the company, but that even so, sales are usually the most reliable evidence. We are accordingly of the opinion that the fact that there was no public knowledge of the negotiations does not detract from the evidentiary value of the sales occurring about the time of the valuation date. Here the public had available to it the usual and normal statistical data regarding the financial condition of the Fulton Trust Company. Furthermore, it is our opinion, under the circumstances, that a full knowledge by the public of the past and existing negotiations would not have materially affected the market price. Such negotiations as had been carried on with The New York Trust Company had been carried on by the chairman of the board of directors of the Fulton Trust Company, and these negotiations had broken down before the valuation date. The negotiations with J. P. Morgan & Co., Inc., had not resulted in an agreement and were terminated a few days after the valuation date. Consequently, at the valuation *317 date there could be no reasonable assurance that a merger would be effected. The evidence shows that the matter of negotiations with The New York Trust Company had not even been taken up with the board of directors or the stockholders. Under the New York Banking Law, before a merger agreement can become effective it must be approved by the directors of both banks, by the Superintendent of Banks, and by the holders of two-thirds of the stock of each bank. Evidence was adduced to show that even in some instances proposed mergers failed after public announcements of the agreements were made. Under the circumstances, it would seem that if for any reason the executors at the valuation date had been required to sell some of the stock they could not have given any prospective buyer any assurance as to a merger. Since the evidence discloses that rumors of bank mergers were prevalent and since the public had available the data that would make a merger of Fulton Trust Company desirable, there is no reason to believe that the prices at which the stock sold on or about the valuation date did not adequately reflect the possibility of merger. The respondent attaches much importance to the provision *318 in the decedent's will wherein he speaks of his block of stock as having a higher potential value than indicated by market prices because of the control of Fulton Trust inherent in its ownership by his fiduciaries or others. Mathematically, the fact belies the decedent's statement and the respondent's argument, as the decedent's shares comprised only about 19 per cent of the outstanding stock. It is recognized that a concentrated block of stock though less than a majority may give effective control of corporate management and policies where the balance of the stock ownership is widely scattered. . However, the evidence here does not establish that control existed. At the hearing both parties adduced evidence in support of the valuation they urge. We have given careful consideration to all such evidence and hold that on the valuation date the block of Fulton Trust stock had a fair market value not in excess of $566,979, which is a value of $147 per share, the value at which it was reported in the return. A stipulation of facts was filed at the hearing which among other things, contained a recitation and exhibits concerning *319 a so-called "Larkin transaction." The Larkin transaction involved the sale by the Fulton Trust Company, in a fiduciary capacity, of stock of Fulton Trust on July 19, 1949, followed by a controversy with a beneficiary as to the sale price, and a subsequent settlement by Fulton Trust with the Larkin estate. At the hearing counsel for the petitioner, under this reserved right, objected to our receipt of the agreed facts as to the Larkin transaction on the ground of materiality and relevancy. Ruling on the objection was reserved. We now hold that the Larkin transaction has no material bearing on the issue before us. At the time of that transaction, July 19, 1949, the negotiators for the banks had reached a tentative agreement as to the major points in the merger and the price to be paid for the Fulton Trust stock. At the valuation date involved in the instant case, there had been no meeting of the minds or agreements as to the terms of merger. In fact, at that date there were no negotiations in progress between the Fulton Trust Company and The New York Trust Company. Accordingly, the objection of counsel for the petitioner is sustained. At the close of the hearing, petitioner's counsel *320 moved to conform the petition to the proof omitting the following statement: "At the valuation date, June 12, 1949, the merger was still in negotiation and the terms thereof had not been agreed upon." The quoted statement appeared in a paragraph of the petition which referred to the price obtained by Fulton stockholders on the merger of Fulton Trust into New York Trust. Ruling on the motion was reserved. In view of the evidence as to the course of negotiation between the banks, the motion is proper and is granted. Decision will be entered under Rule 50. Footnotes
1. In vault and on deposit. ↩
2. Including accrued interest. ↩
3. Reserves for taxes, expenses, and contingencies.↩
1. Book value used here is the total per share of capital, surplus, and undivided profits. ↩
2. Book value at June 30, 1949. ↩
3. Net operating earnings for 1948.↩