ESTATE OF SAUL R. GILFORD, DECEASED, LAUREN E. WURSTER, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 31395-83.        Filed January 12, 1987.

*Wallace M. Wright* and *Scribner L. Fauver*, for the petitioner.

*Frank R. DeSantis*, for the respondent.

HAMBLEN, *Judge*: Respondent determined a deficiency of $4,330,651.21 in the Federal estate tax of the Estate of Saul R. Gilford. After concessions, the sole issue for decision is the date of death fair market value of 381,150 shares of Gilford Instrument Laboratories, Inc., common stock owned by Saul R. Gilford at his death.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the supplemental stipulations of fact, and attached exhibits are incorporated herein by this reference.

Petitioner is the Estate of Saul R. Gilford. On November 17, 1979, Saul R. Gilford (the decedent) died in a private airplane crash. At the time of his death, decedent's domicile was Oberlin, Ohio. Decedent died testate and Lauren E. Wurster (Wurster) was appointed executor of his estate.

Petitioner's Federal estate tax return was timely filed. The alternate valuation date was not elected. Included within the estate were 381,150 shares of stock in Gilford Instrument Laboratories, Inc. (Gilford). Petitioner's return listed the value of this stock as $2,801,452.50, or $7.35 per share. In his notice of deficiency, respondent determined that the fair market value of the Gilford stock should be $9,147,600, or $24 per share.

At the time of decedent's death, Gilford, an Ohio corporation, designed, manufactured, and sold scientific instruments for use in the fields of science, medicine, and industry. Gilford's principal products were automated blood analyzers and spectrophotometers and accessory devices. In 1978, Gilford formed a new wholly owned subsidiary, Gilford Diagnostics, Inc., to manufacture and sell clinical chemistry reagents and related disposable products.

During 1979, Gilford sold and marketed its products in the United States and Canada through direct contact and a sales force of 41 persons. Gilford had wholly owned subsidiaries in England, France, and Germany which serviced these and certain other countries in North Africa, Europe, and Eastern Europe.[1]

Gilford's automated blood analyzers, reagents, and small clinical spectrophotometers were purchased primarily by hospitals and medical laboratories. The research market, consisting of university and private foundation biomedical research laboratories, purchased the research spectrophotometers. Gilford faced competition from small companies and companies as large as DuPont.[2]

In Gilford's 1979 annual report, the consolidated balance sheets for the fiscal years ending July 31, 1979, and 1978, are as follows:

---

[1] Foreign sales representatives provided a sales force for approximately 55 other countries abroad. Gilford had 30 distributors in the United States and Canada to sell reagents and instruments.

Gilford's subsidiaries were as follows:

| Name of subsidiary | State or country of incorporation | Percentage of voting securities |
|---|---|---|
| Gilford Instruments Ltd. | England | 100% |
| Gilford Europe, S.A. | France | 100 |
| Gilford Instruments GmbH | Germany | 100 |
| Gilford Diagnostics, Inc. | Ohio | 100 |
| Gilford Instruments International, Inc. | Ohio | 100 |
| PTR Optics Corp. | Ohio | 100 |
| PTR Optics International, Inc. (1) | Massachusetts | 100 |
| PTR Optics Ltd. (2) | England | 100 |

(1) Wholly owned subsidiary of PTR Optics Corp.
(2) Wholly owned subsidiary of Gilford Instruments Ltd.

All subsidiaries are included in the consolidated financialstatements for 1979.

[2] In each of its major product areas, Gilford faced competition from both large and small companies. In the clinical analyzer market, Technicon was the market leader. Gilford occupied a second-tier position with Beckman and DuPont. In the research spectrophotometer market, Gilford competed with Beckman. In the diagnostic reagent/disposable area, the dominant force was DuPont and Technicon. In this market, Gilford competed against Dow, Hycel, Dade, Harleco, Worthington Biochemical, Boehringer-Mannheim, General Diagnostics, and Hyland.

ASSETS

| Current assets: | 1979 | 1978 |
|---|---|---|
| Cash | $770,763 | $929,753 |
| Receivables, less allowance for doubtful accounts of $140,500 in 1979 and $135,300 in 1978 | 8,717,681 | 7,879,350 |
| Recoverable Federal and foreign income taxes | 549,501 | |
| Inventories: | | |
|   Finished products | 3,486,791 | 2,595,568 |
|   In-process products | 2,384,103 | 2,697,264 |
|   Materials and parts | 2,485,668 | 1,922,327 |
|   Service parts | 1,428,455 | 1,274,258 |
| Deferred income taxes | 234,200 | 155,200 |
| Prepaid expenses | 263,848 | 219,111 |
|     Total current assets | 20,321,010 | 17,672,831 |
| Property, plant and equipment — at cost | | |
|   Land and improvements | $302,717 | $302,717 |
|   Buildings and improvements | 3,374,358 | 3,112,722 |
|   Machinery, equipment, and other | 5,940,767 | 5,053,061 |
|   Construction in progress | 1,575,141 | |
|   Unexpended construction funds invested by trustee | 528,516 | |
|     Total | 11,721,499 | 8,468,500 |
| Less accumulated depreciation | 3,425,322 | 3,091,849 |
|   Property, plant, and equipment net | 8,296,177 | 5,376,651 |
| Other assets | 195,294 | 193,984 |
|     Total | 28,812,481 | 23,243,466 |

LIABILITIES AND SHAREHOLDERS'
EQUITY

| Current liabilities: | | |
|---|---|---|
|   Notes payable | 3,252,000 | 2,399,000 |
|   Current portion of long term debt | 334,400 | 173,200 |
|   Accounts payable | 1,895,000 | 1,360,771 |
|   Accrued expenses: | | |
|     Income taxes | 233,083 | 734,990 |
|     Other taxes | 268,836 | 196,557 |
|     Salaries and wages | 749,406 | 718,917 |
|     Employee benefit plans | 507,000 | 448,000 |
|     Other | 432,081 | 393,033 |
| Product and service warranties | 275,000 | 283,000 |
| Unearned service contract revenue | 996,000 | 718,000 |
|     Total current liabilities | 8,942,806 | 7,425,468 |
| Long-term debt: | | |
|   Obligations under capital lease | 1,670,000 | 835,000 |
|   Other | 2,026,500 | 254,200 |
|     Total | 3,696,500 | 1,089,200 |
| Deferred income taxes | 314,700 | 238,700 |

Shareholders' equity:

| | 1979 | 1978 |
|---|---|---|
| Common stock without par value authorized 2 million shares; issued and outstanding 1,660,499 in 1979 and 1,636,241 in 1978 | $249,075 | $245,436 |
| Additional paid-in capital | 3,224,828 | 2,965,865 |
| Retained earnings | 12,384,572 | 11,278,797 |
| Total shareholders' equity | 15,858,475 | 14,490,098 |
| Total | 28,812,481 | 23,243,466 |

The 1979 annual report also set forth consolidated statements of income for the same fiscal years:

| | 1979 | 1978 |
|---|---|---|
| Net sales | $31,463,301 | $27,099,551 |
| Operating costs and expenses: | | |
| Cost of sales | 16,518,298 | 13,328,644 |
| Selling and administrative expense | 9,937,129 | 7,594,768 |
| Research and development expense | 2,292,625 | 2,062,301 |
| Total | 28,748,052 | 22,985,713 |
| Operating income | 2,715,249 | 4,113,838 |
| Other income (expense): | | |
| Royalties and commissions | 192,261 | 451,134 |
| Interest expense | (431,931) | (212,118) |
| Other net | 32,489 | 197,537 |
| Other income (expense) net | (207,181) | 436,553 |
| Income before taxes on income | 2,508,068 | 4,550,391 |
| Provision for taxes on income: | | |
| Current | 853,000 | 1,908,000 |
| Deferred | (3,000) | 95,000 |
| Total | 850,000 | 2,003,000 |
| Net income | 1,658,068 | 2,547,391 |
| Net income per share (based on the average number of shares outstanding for each year) | 1.01 | 1.57 |

On October 26 to 28, 1979, the Gilford board of directors held a long-range planning meeting in Maine. The drop in net earnings in 1979 concerned the directors, and the discussions at the weekend meeting centered around finding a solution to the earnings problem and establishing a 5-year planning horizon. The consensus of the directors and decedent in particular was that, while no one wanted a merger of the company, there was agreement that both Gilford's poor performance and poor growth could make Gilford vulnerable to a take-over. As a result, the directors

felt that they should set up a profile of a "White Knight" company which could be used as a back-up in a take-over attempt. Any talk concerning a merger was purely hypothetical and of a defensive posture.

Decedent was president and chairman of the board of directors of Gilford. Decedent had held this position continuously since the birth of the company in 1958. At the time of his death, decedent was the largest single shareholder of Gilford, owning 381,150 shares.[3]

Gilford had one class of common stock without par value. On November 16, 1979, there were 1,664,472 shares of common stock outstanding. The common stock was registered pursuant to section 12(g) of the Securities and Exchange Act. At the time of decedent's death, the stock was actively traded in the over-the-counter market.[4]

For the 12 months ending in November 1979, the price and volume of Gilford stock traded was as follows:

| Month | End of month market price | Volume for month |
|---|---|---|
| December 1978 | 14-14½ | 68,317 shares |
| January 1979 | 15½-16 | 49,062 shares |
| February 1979 | 13⅞-14⅜ | 35,571 shares |
| March 1979 | 15¾-16¼ | 63,622 shares |
| April 1979 | 17½-18 | 64,678 shares |
| May 1979 | 14⅜-14⅞ | 51,785 shares |
| June 1979 | 13-13½ | 97,772 shares |
| July 1979 | 13⅜-13⅞ | 64,392 shares |
| August 1979 | 16½-17¼ | 64,481 shares |
| September 1979 | 14-15 | 35,387 shares |
| October 1979 | 12-12¾ | 50,294 shares |
| November 1979 | 11½-12½ | 63,973 shares |

On November 16, 1979, a Friday, the common stock of Gilford Instrument closed in the over-the-counter market at a bid price of 11½ and an asked price of 12¼. On November 19, 1979, Monday, the stock closed at a bid price of 10¼ and an asked price of 11¼.

---

[3]On July 31, 1979, there were 1,660,499 shares outstanding, and the parties stipulated that petitioner's block represented approximately 22.98 percent of the Gilford shares outstanding. The correct percentage is 22.95 percent. On Nov. 16, 1979, the block represented approximately 22.90 percent.

[4]In November of 1979, NASDAQ market makers for Gilford stock were Merrill Lynch, the Ohio Co., Prescott Ball & Turben, Shearson Hayden Stone, Inc., Bache Halsey Stuart, Amswiss International, Wm. C. Rooney & Co., and Cantor Fitzgerald & Co.

The Gilford board of directors first meeting after decedent's death took place on November 27, 1979. The first item of business was the election of a chairman of the board to fill the vacancy created by decedent's death.[5] In connection with the discussion of the chairman's responsibilities, the minutes reflect the board's plan for Gilford's immediate future:

it was suggested that the Board establish some procedure for handling and monitoring inquiries that may be made with respect to offers to acquire the Company. * * * *At the same time, it was agreed that the Company not solicit any such inquiries or offers and that its primary concern at this point is to maintain and restore the momentum of growth experienced by the Company in recent years.* * * * [Emphasis supplied.]

The board planned to meet on December 13, 1979, to discuss the overall state of Gilford's business and future plans.

On December 13, 1979, the board formed a finance committee. The minutes do not reflect any merger discussion.

On December 20, 1979, representatives of Gilford's board of directors contacted Kidder Peabody & Co. (Kidder, Peabody) to evaluate Kidder, Peabody as a potential financial consultant to Gilford. On January 2, 1980, Gilford entered into an agreement with Kidder, Peabody for Kidder, Peabody to evaluate financial alternatives for Gilford. During March 1980, the Gilford board of directors began to seriously consider merging with another company. On May 19, 1980, the Wall Street Journal noted that Gilford was considering all available financial options, including affiliation with another company or remaining independent. Petitioner's block of stock was sold to Corning Glass Works of Corning, New York (Corning Glass), for $24 a share pursuant to an agreement entered into by Wurster and Corning Glass dated May 30, 1980. The agreement was submitted simultaneously with the merger proposal to the Gilford board of directors. On May 30, 1980, the board of directors agreed to merge Gilford with Corning Glass if certain conditions were met. This information was publicly reported in the Wall Street Journal on June 2, 1980. On

---

[5]The board voted to elect Bronson P. Clark as the new chairman of the board.

October 10, 1980, the shareholders of Gilford approved the merger with Corning Glass.

On February 15, 1980, prior to the filing of decedent's Federal estate tax return, petitioner retained Allyn A. Joyce (Joyce), senior vice president of Management Planning, Inc., of Princeton, New Jersey, to value decedent's 381,150 shares of Gilford common stock. Joyce submitted his valuation report to Wurster on July 29, 1980.

Joyce's definition of fair market value was the price that a willing buyer would pay a willing seller for the block of Gilford stock, if both buyer and seller were reasonably well informed as to the facts and neither was under any compulsion to act. In order to reach an accurate estimate of the fair market value according to this definition, Joyce examined carefully three characteristics of decedent's stock: (1) Its market price at the date of death; (2) the size of the block of stock; and (3) the restricted nature of the stock.

First, in order to reach a market price for the date of decedent's death, which occurred on a Saturday, Joyce evaluated the market on Friday, November 16, 1979, and on Monday, November 19, 1979. Joyce took the mean of each day's quotations and then averaged those mean figures to reach an average of $11.31 per share for November 17, 1979. In Joyce's opinion, the market price quotation of $11.31 reflected such considerations as the nature of the Gilford business, the economic outlook of the instruments industry, the company's book value, its earning capacity, its dividend paying capacity, and goodwill.[6] In considering these factors, Joyce attempted to follow the factors enumerated in section 4 of Rev. Rul. 59-60, 1959-1 C.B. 237, 238-239.

Second, Joyce believed that the entire block of 381,150 shares could not have been sold at the market price of $11.31 on November 17, 1979. While Gilford was an active stock on the over-the-counter market, Joyce reviewed the annual volume data for Gilford shares and concluded that

---

[6]The market quotations of Gilford stock dropped to a yearly low of 10¼ bid price on Monday, Nov. 19, 1979, presumably reflecting the death of decedent. Thus, Joyce noted that an adjustment for decedent's death existed in the mean figures used to reach the $11.31 market price on Nov. 17, 1979.

the market could not absorb a block of this size.[7] Therefore, in Joyce's opinion, a blockage discount was in order.

Third, and more importantly, decedent's block of common stock was a "restricted security" under the Federal securities laws.[8] Petitioner could sell this stock under three methods: (1) The dribble-out rule;[9] (2) a private placement; or (3) a public offering. As a result, in Joyce's view, the only method of valuing the block of Gilford stock was to estimate the price a willing buyer would pay a willing seller for a restricted stock in a private placement.

Joyce utilized the four factors of Rev. Rul. 77-287, 1977-2 C.B. 319, 320, to evaluate the market value of the restricted Gilford stock. These four factors were:

(1) the size of the issuing company measured by its sales
(2) the size and pattern of its earnings;
(3) the trading market; and
(4) resale agreement provisions

In order to determine the appropriate discount to be applied to petitioner's block of stock, Joyce carefully picked other transactions involving restricted securities which came as close as possible to the Gilford block of stock on the four factors. Because financial institutions do not ordinarily reveal detailed information on their transactions in restricted securities, Joyce carefully examined the restricted over-the-counter stock transactions of investment companies. Joyce found 14 companies with restricted stock transactions which he found comparable with the Gilford stock.[10] Joyce then examined the four factors in each

---

[7]The monthly volume for Gilford common stock from December 1978 to November 1979 is noted in the text *supra*. The highest volume is for June 1979 in the amount of 97,772 shares.

[8]The Securities and Exchange Commission considered decedent to be a "parent" of Gilford for securities law purposes. As a result, decedent's and petitioner's Gilford stock was a restricted security as defined by the Securities and Exchange Commission's rule 144.

[9]Joyce noted that Gilford stock had an average weekly trading volume of 14,000 shares. Therefore, the willing buyer of this block of stock could sell 14,000 shares of stock every 3 months under rule 144. At this rate, decedent's 381,150 shares would not be disposed of for 7 years.

[10]These companies are industrial stock companies and are as follows: American Nuclear Corp., Analog Devices, Inc., Arnav Industries, Inc., Chemical & Pollution Sciences, Inc., Giffen Industries, Inc., Interfashion, Inc., Jewelcor, Inc., Miles-Samuelson, Inc., National Computer Corp., Parker Drilling Co., the Service Group, Inc., TBS Computer Centers Corp., the Valtronic Corp., and Volt Information Sciences, Inc.

In order to be a "comparable" company, Joyce established the following criteria with which each company's stock had to comply: (1) The company did not experience an earnings deficit in either of the 2 fiscal years preceding the acquisition of its restricted stock; (2) the company

company and compared the results to Gilford to reach an accurate discount.

First, Joyce concluded that, on the basis of the size of Gilford as measured by sales, its restricted stock should have a discount of 32 percent. Second, on the basis of Gilford's income and its earnings decline, its restricted stock should have a discount of 30 to 33 percent. Third, Joyce noted that discounts were greatest on restricted stock whose unrestricted counterparts traded over the counter, followed by those with unrestricted counterparts traded on the American Stock Exchange, while discounts for stocks with unrestricted counterparts listed on the New York Stock Exchange were the smallest. Fourth, Joyce analyzed stock price variability and resale agreement provisions and found nothing which would cause him to deviate from a 33-percent discount. Finally, Joyce viewed the stability of stock prices and the state of the market as a whole.[11]

Based on all these factors, Joyce concluded that the appropriate discount from the market average quotation of Gilford on November 17, 1979, is 35 percent.[12] The application of a 35-percent discount to the average market discount results in a discount of $3.96 per share, resulting in a fair market value of $7.35 for each of the restricted shares of Gilford.

In his notice of deficiency dated August 10, 1983, respondent determined that decedent's 381,150 shares of Gilford stock had a value of $9,147,600, or $24 per share, on November 17, 1979. Respondent asserts that the sale or merger of Gilford was foreseeable to the representatives of petitioner on the date of decedent's death and, therefore, the fair market value of the block of Gilford stock of November 17, 1979, was $24 per share.

---

must have been in business for at least 3 fiscal years prior to the acquisition of its restricted stock; (3) there must be sufficient public financial data available concerning the company so that the public market is a well informed one; and (4) there was an active market for the company's stock at the time of the acquisition of the restricted shares.

[11]Joyce believed that the ability to have a successful public offering of industrial stock was somewhat difficult in the 1980 market and that the 33-percent discount may be too low. However, the attractiveness of Gilford in the technological field would offset this disadvantage. Joyce also noted that the NASDAQ index was in decline for 6 weeks prior to the valuation date.

[12]As the discount for the restricted nature of the stock centered on a 33-percent figure, the 2-percent increase must reflect Joyce's additional discount for blockage.

ULTIMATE FINDINGS OF FACT

The fair market value of each share of Gilford common stock held by the decedent on November 17, 1979, is $7.58, with a total fair market value of $2,889,117.

OPINION

Property includable in the gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a);[13] sec. 20.2031-1(b), Estate Tax Regs.[14]

The standard definition of "fair market value" is the price at which the property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. *United States v. Cartwright*, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

Section 20.2031-2, Estate Tax Regs., delineates with somewhat more clarity the valuation of stock and bonds. In general, the value of stock is the fair market value per share on the applicable valuation date. Sec. 20.2031-2(a), Estate Tax Regs.; *Estate of Damon v. Commissioner*, 49 T.C. 108 (1967). Section 20.2031-2(b)(1), Estate Tax Regs., provides in part:

In general, if there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond. If there were no sales on the valuation date but there were sales on dates within a reasonable period both before and after the valuation date, the fair market value is determined by taking a weighted average of the means between the highest and lowest sales on the nearest date before and the nearest date after the valuation date. The average is to be weighed inversely by the respective numbers of trading days between the selling dates and the valuation date. * * *

---

[13]Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect at the date of the decedent's death.

[14]Sec. 2031(a) was originally enacted as sec. 202 of the Revenue Act of 1916. Sec. 2031(b) was originally enacted as sec. 501 of the Revenue Act of 1943. The legislative history is void of any substantive guidance and we are forced to turn to the regulations and case law to elucidate the meaning of "fair market value." In this regard, we note that, "Men have all but driven themselves mad in an effort to definitize" the meaning of value. *Andrews v. Commissioner*, 135 F.2d 314, 317 (2d Cir. 1943).

However, if actual sales are not available during a reasonable period beginning before and ending after the valuation date, sec. 20.2031-2(c), Estate Tax Regs., provides that:

the fair market value may be determined by taking the mean between the bona fide bid and asked prices on the valuation date, or if none, by taking a weighted average of the means between the bona fide bid and asked prices on the nearest trading date before and the nearest trading date after the valuation date, if both such nearest dates are within a reasonable period. The average is to be determined in the manner described in paragraph (b) of this section.

Finally, in cases where the stock's selling prices or bid and asked prices do not reflect fair market value, then "some reasonable modification of that basis or other relevant facts and elements of value are considered in determining the fair market value." Sec. 20.2031-2(e), Estate Tax Regs. Section 20.2031-2(e), Estate Tax Regs., sets forth the following examples of such instances:

Where sales at or near the date of death are few or of a sporadic nature, such sales alone may not indicate fair market value. In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. * * * On the other hand, if the block of stock to be valued represents a controlling interest, either actual or effective, in a going business, the price at which other lots change hands may have little relation to its true value.

Thus, in valuing stock which is sold on an active market, the estate tax regulations delineate a three-fold test to determine the fair market value of stock. First, if there is a market on a stock exchange or an over-the-counter market, the regulations look to the selling prices on or within a reasonable period before and after the valuation date. Second, in the absence of actual selling prices, the bid and asked prices are examined.[15] Finally, if the selling prices or bid and asked prices do not reflect accurately the fair market value of the stock, reasonable modification of the

[15]See *Steinberg v. Commissioner*, T.C. Memo. 1983-534, affd. 771 F.2d 183 (6th Cir. 1985).

selling prices or the bid and asked prices may be considered.[16]

The question of fair market value is a question of fact, and the trier of fact must weigh all relevant evidence and draw appropriate inferences. *Hamm v. Commissioner*, 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; *Estate of Andrews v. Commissioner*, 79 T.C. 938, 940 (1982). Given the complicated nature of this valuation case, we note that valuation issues are inherently imprecise and capable of resolution only by a Solomon-like pronouncement. *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980); *Messing v. Commissioner*, 48 T.C. 502, 512 (1967).

As this case is appealable to the Court of Appeals for the Sixth Circuit, we have endeavored to follow that court's view of the valuation process. *Golsen v. Commissioner*, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Thus, where we disagree with the valuation offered by both petitioner and respondent, we may not simply shut our eyes and "pick at random any number that happens to lie somewhere between the Commissioner's valuation and the taxpayer's." *Akers v. Commissioner*, 798 F.2d 894, 897 (6th Cir. 1986). Rather, we must explain how we arrived at our conclusion on valuation in a logical manner. *Akers v. Commissioner*, *supra* at 897. We now proceed to do so.

Petitioner asserts that, since decedent's Gilford stock was traded in the over-the-counter market, the fair market value per share should be determined by reference to the market quotations immediately before and after the Saturday on which decedent's death occurred. Additionally, petitioner states that a reasonable modification of the fair market value determined by reference to the market quotations must be made due to two factors: (1) The size of the block of stock and (2) the "restricted" nature of the stock.

On the other hand, respondent asserts that while actual market quotations are generally determinative of fair market value for publicly traded securities, the sale or merger

[16]Sec. 20.2031-2(f), Estate Tax Regs., sets forth the criteria to be taken into consideration where selling prices or bid and asked prices are unavailable. We find that this regulatory section is inapposite to our case in that bid and asked prices are available.

of Gilford to Corning Glass created an abnormal market condition which should control the value of the stock. Respondent contends that the agreement between petitioner and Corning Glass on May 30, 1980, was the culmination of a series of events set off by the decedent's death. Rejecting petitioner's blockage and restricted share discount, respondent asserts that petitioner's block of shares was *more* valuable because of its size. More importantly, respondent contends that the purchase price paid for the stock by Corning Glass was the product of arm's-length negotiations between a willing buyer and a willing seller, both with reasonable knowledge of all relevant facts, and therefore reflects the accurate fair market value of the stock.

In considering and weighing all relevant evidence in the record, we acknowledge that a presumption of correctness attaches to respondent's determination of deficiency. *Welch v. Helvering*, 290 U.S. 111 (1933). This presumption is a procedural device which requires petitioner to come forward with enough evidence to support a finding contrary to the determination. *Rockwell v. Commissioner*, 512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; see rule 301, Federal Rules of Evidence. Petitioner also bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. This burden is a burden of persuasion; it requires petitioner to demonstrate the merits of its claim by at least a preponderance of the evidence. *Rockwell v. Commissioner, supra*. Respondent's presumption and petitioner's burden of proof thus impose two separate and distinct obligations: (1) The burden of going forward, and (2) the burden of persuasion.

To rebut respondent's presumption, petitioner must introduce some substantial evidence tending to show that respondent was wrong. Where petitioner has not offered evidence sufficient to rebut respondent's presumption, respondent prevails. *Rockwell v. Commissioner, supra*; *American Pipe & Steel Corp. v. Commissioner*, 243 F.2d 125, 126 (9th Cir. 1957), affg. 25 T.C. 351 (1955).

First, we will examine respondent's assertion that the sale or merger of Gilford was foreseeable to petitioner's representatives on November 17, 1979, and, thus, should be conclusive that petitioner's block of Gilford stock could

have sold at a substantial premium of $24 per share on decedent's death. While the question of fair market value is a question of fact, the criterion to be applied in determining value is a matter of law. *Morris v. Commissioner*, 761 F.2d 1195, 1200 (6th Cir. 1985). Thus, we must decide as a matter of law whether a subsequent merger of a company should be considered as a criterion in determining value of its stock.

In general, property is valued as of the valuation date on the basis of market conditions and facts available on that date *without regard to hindsight*. However, we have held that postmortem events can be considered by the Court for the "limited purpose" of establishing what the willing buyer and seller's expectations were on the valuation date and whether these expectations were "reasonable and intelligent." *Estate of Jephson v. Commissioner*, 81 T.C. 999 (1983).[17] The rule that has developed, and which we accept, is that subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation. See, e.g., *Ithaca Trust Co. v. United States*, 279 U.S. 151 (1929); *Estate of Van Horne v. Commissioner*, 720 F.2d 1114, 1116 (9th Cir. 1983), affg. 78 T.C. 728 (1982), cert. denied 466 U.S. 980 (1984); *Guggenheim v. Helvering*, 117 F.2d 469 (2d Cir. 1941), cert. denied 314 U.S. 621 (1941); *Couzens v. Commissioner*, 11 B.T.A. 1040, 1165 (1928). In *Estate of Jephson v. Commissioner*, 81 T.C. at 1002, we explained, by reference to *Couzens*, how subsequent events may be utilized in determining value:

Serious objection was urged by respondent to the admission in evidence of data as to events which occurred after March 1, 1913 [the valuation date]. It was urged that such facts were necessarily unknown on that date and hence could not be considered. It was apparent that there was a fear that the Board would in reaching its judgment be influenced toward a higher value if it were permitted to see the evidence of increasing value after the date in question. The evidence was nevertheless admitted. It is true that value on March 1, 1913, is not to be judged by subsequent events. *There is, however, substantial importance in the reasonable expectations entertained on that date. Subsequent events may serve to*

---

[17]As respondent has recognized in Rev. Rul. 59-60, 1959-1 C.B. 237, 238:

"Valuation of securities is, in essence, a prophesy as to the future and *must be based on facts available at the required date of appraisal.* * * * [Emphasis added.]

*establish both that the expectations were entertained and also that such expectations were reasonable and intelligent.* Our consideration of them has been confined to this purpose. Such subsequent events as have no reasonable relation to the considerations of the date in question have been disregarded. We have not, by looking at the subsequent events now known, found what the value would have been had they been definitely known on March 1, 1913. *The only facts upon which our judgment of value has been predicated are those reasonably known on that date. These included not only those which had completely occurred, but also those which were in process and those which were reasonably in contemplation.* [*Couzens v. Commissioner,* 11 B.T.A. 1040, 1165 (1928). Emphasis supplied.]

Petitioner argues that post-valuation-date documents are not admissible as evidence in support of a higher valuation of petitioner's stock unless respondent can show their relevance by connecting them to the valuation date. In *Morris v. Commissioner, supra,* the Court of Appeals for the Sixth Circuit stated that this Court did not abuse its discretion in refusing to permit introduction of evidence concerning the state of development on decedent's property 8 years after the valuation date. Of particular interest to this case, the Sixth Circuit in *Morris* pointed to the language of *Walter v. United States,* 341 F.2d 182, 185 (6th Cir. 1965), where that court stated:

It also must be kept in mind that the measure of the tax must be determined according to the situation as it existed on the date of the death of the decedent, and not according to subsequent events, "[t]empting as it is to correct uncertain probabilities by the now certain fact * * * ." *Ithaca Trust Co., Executor v. United States,* 279 U.S. 151, 155 (1929). [*Morris v. Commissioner,* 761 F.2d at 1201.]

However, the Sixth Circuit recognized the holding of *Estate of Jephson* stating that "subsequent events may only be considered if they were reasonably known on the date of valuation and also that such could be reasonably contemplated on that date." *Morris v. Commissioner, supra* at 1201.

In light of the Sixth Circuit's opinion in *Morris v. Commissioner,* we believe that the rule against admission of subsequent events is a rule of relevance. Rule 401, Federal Rules of Evidence, applicable in this Court pursuant to Rule 143, Tax Court Rules of Practice and Procedure, and section 7453, defines relevant evidence as "evidence having any

tendency to make the existence of any *fact* that is of consequence to the determination of the action more or less probable than it would be without the evidence." (Emphasis added.) See *Armco, Inc. v. Commissioner*, 87 T.C. 865 (1986). Unlike the facts in *Morris v. Commissioner*, the subsequent events took place less than 1 year from the valuation date, not 8 years later. Because the evidence of post-death events would prove or disprove whether there was a reasonable and intelligent expectation of a merger on November 17, 1979, we find such evidence to be relevant within the meaning of rule 401.[18]

With this question settled, we now turn to the factual inquiry as to the fair market value of petitioner's stock. As a part of this factual inquiry, we will determine on the basis of all evidence, including the post-death documents, whether a merger of Gilford or sale of petitioner's stock for $24 a share--was a reasonable and intelligent expectation on the date of decedent's death.

First, respondent asserts that the merger agreement was foreseeable on November 17, 1979, and that a willing buyer existed who would pay the $24-per-share price for which petitioner's stock was sold in the Gilford-Corning Glass merger. After a careful review of the entire record, we cannot agree with respondent. While Gilford did have a net earnings decline in 1979, and the directors, including decedent, were concerned, there is no evidence to suggest that there was a willing buyer and willing seller for the stock for $24 per share on November 17, 1979. While there was some discussion at the October 1979 board of directors meeting concerning the possibility of a merger, the discussion was purely hypothetical and of a defensive nature.[19] Even after decedent's death, the Gilford directors were not immediately in search of a potential merger partner. It was not until March 1980 that serious plans began to form to court potential merger partners. On November 17, 1979, there was no reasonable or intelligent expectation that a

---

[18]The facts presented by these documents go to the weight of the evidence, not its admissibility. *First Nat. Bank of Kenosha v. United States*, 763 F.2d 891, 894 (7th Cir. 1985).

[19]We note that directors have a fiduciary duty to act in the best interests of the corporation and its shareholders. *United States v. Byrum*, 408 U.S. 125, 142 (1972). Consequently, the Gilford directors acted appropriately in considering the possibility of a defensive merger given the vulnerability of Gilford to an inopportune takeover attempt.

merger of Gilford or a sale of petitioner's block of stock between a willing buyer and a willing seller for $24 per share would take place.[20]

The valuation of stock by hindsight analysis is especially inappropriate where there is an active market. Not only is the purpose of section 2031 and its regulations to pinpoint the valuation date for clarity and certainty of conclusion, but where public markets exist for stock, the market should be considered to have assimilated all available information.[21] We reiterate that section 20.2031-1(b), Estate Tax Regs., states that:

The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell *and both having reasonable knowledge of relevant facts.* * * * [Emphasis added.]

Respondent is not only overreaching the regulations but is arguing contrary to his Rev. Rul. 59-60, which states: "Valuation of securities is, in essence, a prophesy as to the future and must be based on facts available at the required

[20]We note that in a Memorandum Opinion this Court has held that in valuing over-the-counter stock of a corporation, the merger of the corporation approximately 1 year after decedent's death should not be taken into account in valuing the shares. There had not been any meeting of the minds or agreement on the terms of merger, no pending merger negotiations, no public knowledge, and no rumors as to any merger negotiations on the valuation date. *Estate of Prentice v. Commissioner*, T.C. Memo. 1956-3. In this regard, we distinguish *Silverman v. Commissioner*, 538 F.2d 927 (2d Cir. 1976), affg. a Memorandum Opinion of this Court, where that court found that the taxpayers brought forth no evidence to support that there was no plan or intention of going public. Moreover, this Court has held that a sale of actively traded over-the-counter stock at a premium 3 months after the valuation date is "not a factor to be considered in establishing the value of the estate's stock at the valuation date." *Estate of Damon v. Commissioner*, 49 T.C. 108, 117 (1967).

We have examined the cases cited by respondent and find them to be inapplicable to the facts of this case. While in *Estate of Schroeder v. Commissioner*, 13 T.C. 259 (1949), we held that a subsequent event may be considered in determining value as of the valuation date, we also stated that one sale cannot establish a fair market value of the stock. Moreover, in *Estate of Schroeder* and other cases cited by respondent which utilize post-death sales for valuation purposes, we found that (1) these sales, *in the absence of more reliable evidence* (such as stock market prices or quotations) represented the most persuasive evidence of fair market value, or (2) the sales involved unique property such as real property. See, e.g., *Estate of Kaplin v. Commissioner*, 748 F.2d 1109 (6th Cir. 1984); *Estate of Shlensky v. Commissioner*, T.C. Memo. 1977-148; *Estate of Ballas v. Commissioner*, T.C. Memo. 1975-103. As a result, we find them distinguishable from the case in issue.

[21]See *Estate of Sullivan v. Commissioner*, T.C. Memo. 1983-185. See also Watts, "The Fair Market Value of Actively Traded Securities," 30 Tax Law. 51, 62-63 (1976). For more than 5 months after decedent's death, the market for Gilford stock remained active at prices near the price at decedent's death. Once public information was released concerning the interest of Corning Glass in Gilford, the market reacted vigorously. However, even after the announcement of the merger agreement on May 30, 1980, the contingency and delay inherent in a merger transaction caused the Gilford stock to trade at prices lower than $24 per share.

date of appraisal." 1959-1 C.B. 237. To rule for respondent in this case would reject the few strands of clarity in this murky world of valuation. This we refuse to do.

Petitioner relies primarily upon the valuation and testimony of its expert witness, Joyce. Respondent chose not to place in evidence any expert valuation. Neither did respondent have an expert witness testify at trial. Expert opinion is admissible if it will assist the trier of fact to understand evidence that will determine a fact in issue. See rule 702, Federal Rules of Evidence. We must weigh such evidence in the light of the demonstrated qualifications of the experts and all other relevant evidence of value. *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. Furthermore, we are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. *Barry v. United States*, 501 F.2d 578, 584 (6th Cir. 1974); *Kreis' Estate v. Commissioner*, 227 F.2d 753, 755 (6th Cir. 1955). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938). Although we are inclined toward accepting the more persuasive and, in this case, sole expert valuation (*Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980)), we are not required to accord such valuation total acceptance. *Parker v. Commissioner*, 86 T.C. 547, 562 (1986). Where the nonprevailing party has clearly shown to our satisfaction a significant error in the expert testimony we find most persuasive, appropriate adjustments will be made. Moreover, in those situations where expert opinion is not sufficiently probative, we rely on other evidence or on the applicable burden of proof.[22] With these general principles in mind, we turn to the facts, evidence, and expert opinion presented by petitioner in this case.

First, we agree with Joyce's analysis of the market quotation of the Gilford stock on the date of decedent's death. Where a security is traded over the counter, it is often difficult to establish actual sales prices on numbers of shares sold, since only bid and asked prices are published. Section 20.2031-2(c), Estate Tax Regs., recognizes this problem and provides that where "bona fide" bid and asked

---

[22]See *Estate of Obering v. Commissioner*, T.C. Memo. 1984-407.

prices are available, the mean establishes the market. See *Estate of McNary v. Commissioner*, 47 T.C. 467 (1967).

Joyce utilized the mean formula to arrive at the pre-discount market price of $11.31 per share on November 17, 1979. As November 17, 1979, fell on a Saturday, Joyce used the mean bid and asked prices on Friday, November 16, and Monday, November 19. As expressly outlined by the regulations, Joyce then took these mean figures and averaged them for a market price of $11.31. Sec. 20.2031-2(c) and sec. 20.2031-2(b)(3), example (3), Estate Tax Regs. Joyce then evaluated the market quotation of the stock in terms of the factors enumerated in section 4 of respondent's Rev. Rul. 59-60, and found that the market price reflects such considerations as the nature of the business, the economic outlook of the instrument industry, the company's book value, its earning capacity, its dividend paying capacity, and goodwill.[23] Moreover, the stock quotation reflected the decedent's death as the bona fide asking price dropped to 10¼, the lowest of the year, on November 19, 1979. We find that petitioner has proved that the pre-adjustment market price of Gilford stock on November 17, 1979, was $11.31.

Second, petitioner, relying on Joyce's valuation, asserts that, due to blockage and the restricted nature of the securities, the $11.31 value of petitioner's block of Gilford stock should be discounted by 35 percent. For the following reasons, we think Joyce's discount figure of 35 percent was too large to the extent that it included a 2-percent discount for blockage.

First, while the regulations provide for a blockage discount in "certain exceptional cases," petitioner must meet his burden of proof as to the correctness and amount of the blockage discount. Petitioner has failed in this respect. There is no presumption of blockage. *Maytag v. Commissioner*, 187 F.2d 962 (10th Cir. 1951).[24] See also *Estate of Van Horne v. Commissioner*, 720 F.2d 1114 (9th Cir. 1983), affg. 78 T.C. 728 (1982), cert. denied 466 U.S. 980 (1984). Joyce does not give convincing reasons why a blockage

---

[23]As Rev. Rul. 59-60, 1959-1 C.B. 237, 238, provides instruction in the valuation of stock of corporations where market quotations are *not available*, it was not mandatory for Joyce to take these factors into account. However, Joyce's evaluation of these factors is helpful.

[24]See *Estate of Sawade v. Commissioner*, 795 F.2d 45 (8th Cir. 1985), affg. a Memorandum Opinion of this Court; *Estate of Christie v. Commissioner*, T.C. Memo. 1974-95.

discount should apply, and he does not give a definitive blockage discount percentage, preferring to factor it into the total discount. This is not sufficient to meet petitioner's burden of proof.[25]

As to the discount for restricted stock, Joyce carefully followed the procedures outlined in Rev. Rul. 77-287, 1977-2 C.B. 319, and examined comparable restricted stock to reach a discount of 33 percent. Rather than bring forth his own expert analysis, respondent attempted to destroy the credibility of Joyce's valuation on cross-examination of Joyce at trial. In particular, respondent pointed to the language of section 4 of Rev. Rul. 59-60, which is incorporated in Rev. Rul. 77-287, 1977-2 C.B. at 321. Following the mandate of section 2031(b), section 4 of Rev. Rul. 59-60 requires the appraiser of closely held stock to evaluate the stock of comparable companies in the "same or similar line of business." 1959-1 C.B. at 242. Respondent contends that, in arriving at his valuation of petitioner's block of Gilford stock, Joyce did not compare stock of companies in the "same or similar line of business." On a careful examination of the record and the law of this area, we agree with Joyce's analysis for the following reasons.

Restricted securities are securities acquired from an issuer in a transaction exempt from the registration requirements of the Federal securities laws. Such a transaction is known as a private placement. Not only do the Federal securities laws compel registration when securities are sold by a company, but also when a person controlling a company sells a substantial block of stock. However, securities acquired in a non-public offering, directly or indirectly from an issuer (including a person who controls the issuer), can be resold in accordance with the requirements of SEC rule 144 by affiliates of the issuer. 17 C.F.R. sec. 230.144 (1986). Pursuant to SEC rule 144, the amount of stock that can be sold by any person during any 3-month period cannot exceed 1 percent of the outstanding class of securities or the average weekly reported trading volume over the appropriate 4-week period. 17 C.F.R. sec. 230.144(e)(1). In

---

[25]We also note that decedent's death depressed the bid and asked prices on the Monday following his death. The blockage discount should not duplicate the market's own discount. See *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 91 n. 4 (3d Cir. 1975), cert. denied 423 U.S. 1037 (1975).

addition, SEC rule 144 requires the holder of the securities to have held them for at least 2 years prior to sale. As a result of the SEC rule 144 limitations, securities subject to SEC rule 144 are often "privately placed" with a group of sophisticated investors. These investors buy these securities at a discount primarily because of the restrictions on their resale.

In his valuation report, Joyce recognizes the resale problem of restricted securities. While decedent did not have direct control of Gilford by owning more than 50 percent of the outstanding stock, decedent did have indirect control over the company as its largest shareholder and moving force behind its success as its only president. As a result, petitioner would be considered a parent of the issuer and any sale of the Gilford shares not issued in a public offering would be classified as restricted shares.[26] Joyce concludes that the correct method of valuation is to estimate the price a willing buyer would pay a willing seller for the restricted block of petitioner's Gilford stock.

As we have established earlier, for purposes of the estate tax, the fair market value of over-the-counter stock is, in the absence of selling prices, ordinarily deemed to be the mean between the highest and lowest quoted bid and asked prices on the date of death. Sec. 20.2031-2(c), Estate Tax Regs.; *Estate of Piper v. Commissioner*, 72 T.C. 1062, 1072 (1979). However, if stock is subject to resale restrictions under the Federal securities laws which prevent it from being sold freely in the public market, a discount from the mean may be necessary to measure the stock's value accurately. *Estate of Piper v. Commissioner*, *supra* at 1072; see also *Bolles v. Commissioner*, 69 T.C. 342 (1977); *Hirsch v. Commissioner*, 51 T.C. 121 (1968); *Husted v. Commissioner*, 47 T.C. 664 (1967).

Petitioner, through Joyce's testimony and valuation report, introduced credible evidence that the average discount for a block of over-the-counter restricted securities of a company with the sales and earnings of Gilford was 33 percent. Joyce carefully followed the procedure which re-

---

[26]See note 8 *supra*. While securities could be sold by petitioner without compliance with SEC rule 144 if petitioner were not an affiliate, petitioner holds 10 percent or more of the total beneficial interest in the issuer and is thus an affiliate. 17 C.F.R. sec. 230.144(a)(2).

spondent has enunciated in Rev. Rul. 77-287. While Joyce may not have chosen comparable companies in the "same or similar line of business" as Gilford, we do not find such a choice fatal to Joyce's valuation for the following reasons.[27]

First, in his valuation report, Joyce sought to obtain information on transactions in restricted stock. While Joyce was handicapped to some extent in that financial institutions do not ordinarily reveal detailed information concerning their restricted security transactions, Joyce utilized investment companies for descriptions of blocks of restricted securities. Joyce found 13 investment companies that acquired restricted securities. From each investment company, Joyce evaluated industrial restricted stock. Some of these stocks were health-care related. However, many of the restricted stocks were not comparable for various reasons.[28] After an exhaustive study, Joyce found 14 over-the-counter restricted stocks to compare to Gilford in light of the four factors of Rev. Rul. 77-287. Under the circumstances, we find Joyce did an adequate job.[29]

Second, we find that Joyce's discount corresponded to the findings of the Securities and Exchange Commission's Institutional Investor Study Report (the study) on which Rev. Rul. 77-287 relies.[30] We note that Joyce considered two key factors in valuing restricted stock contained in the study. First, the size of the discount varied among trading markets. In general, the discount was greatest for restricted

---

[27]In cases which involve closely held stock with no sales or market quotations, such an approach may present a greater difficulty given the mandate of sec. 2031(b) and sec. 20.2031-2(f), Estate Tax Regs. See *Northern Trust Co. v. Commissioner*, 87 T.C. 349 (1986); *Estate of Yeager v. Commissioner*, T.C. Memo. 1986-448. While most investors would examine similar line of business stock even though such stock was traded actively, we believe that Joyce's study adequately evaluated Gilford's market situation.

[28]For example, Bio-Medical Science, Inc., had insufficient financial data. National Hospital Corp. had no recent information. Other companies had deficits in prior years or an inactive market. Thus, there was not sufficient information to compare.

[29]In evaluating the financial position of Gilford, Kidder, Peabody compared its common stock to selected analytical manufacturers. Beckman and Technicon were traded on the New York Stock Exchange. Galman Sciences was traded on the American Stock Exchange. Finnigan Corp., Instrumentation Laboratory, and Nicolet Instrument were traded over the counter. Near the date of decedent's death, these over-the-counter stocks carried bid quotations of 14, 13½, and 19⅞, respectively. Despite the fact that Joyce did not use these three over-the-counter stocks as comparable stocks, we believe that the discount is valid given the restricted nature of petitioner's stock.

[30]See Securities and Exchange Commission, Institutional Investor Study Report, H. Doc. 92-64, Vol. 5, 92d Cong., 1st Sess. (1971).

stock traded over the counter. [31] Second, the study found that the pattern and growth of earnings greatly affected the size of the discount.[32] As Joyce noted, Gilford had an earnings decline in 1979, a fact which investors would have taken into account.

Finally, while we tend to agree with respondent that an investor would have inspected stock in the same or similar line of business, the statute and regulations recognize that this is of key importance in the absence of sales or bid and asked prices. Indeed, respondent's Rev. Rul. 59-60 discusses valuing stock of closely held corporations *where market quotations are not available.* Moreover, Rev. Rul. 59-60 states:

Although the only restrictive requirement as to comparable corporations specified in the statute is that their lines of business be the same or similar, *yet it is obvious that consideration must be given to other relevant factors in order that the most valid comparison possible will be obtained.* * * * [1959-1 C.B. at 242; emphasis added.]

In sum, after carefully reviewing the study, the record as a whole, and carefully considering all arguments raised by petitioner and respondent, we conclude that Joyce's report made the most valid stock comparisons possible with respect to restricted stock and that a discount of 33 percent is appropriate.

While respondent argues that petitioner's block of stock is more valuable than its mean quotation price, he offered no evidence of a proper premium to be applied to the stock. Except for the blockage discount, we find that petitioner has introduced sufficient evidence to establish a prime facie case. Thus, the burden of going forward with the evidence, but not the burden of proof, shifts to the respondent. *Byrum v. Commissioner*, 58 T.C. 731 (1972). Here, respondent called no witnesses, offered no exhibits expressly to refute the discount asserted by petitioner, and developed nothing on cross-examination, relying only on his "foreseeable" merger argument and corresponding evidence which we have found ill-conceived. Thus, on the record, we hold

---

[31]In fact, the study found that only 37 percent of restricted stocks traded over the counter were purchased at discounts not exceeding 20 percent. See Institutional Investor Study Report, *supra* at 2445.

[32]Institutional Investor Study Report, *supra* at 2449.

that petitioner has satisfied his burden of proof as to the fair market value for petitioner's block of Gilford stock. As a result, the correct valuation of petitioner's block of Gilford stock on November 17, 1979, is $7.58 per share, or a total fair market value of $2,889,117.

Finally, in closing, we think it pertinent to allude to an observation we recently made concerning adamant and overzealous contentions in valuation disputes which fail to consider the inherent imprecision of value determinations and, consequently, denigrate the settlement process as noted in *Messing v. Commissioner*, 48 T.C. 502, 512 (1967), and *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 451-452 (1980). In these times of overcrowded Court dockets and resulting delays in case disposition, the parties would be well advised to consider resolution of valuation disputes outside the litigation arena and with a commonsense approach.[33] However, the parties here having agreed to disagree:

We have endeavored, in this opinion, to set forth the underpinnings for our ultimate determination so as to provide, in the event of an appeal, a "trail for the appellate court to follow," see *Akers v. Commissioner*, [798 F.2d 894, 897 (6th Cir. 1986)], but we are constrained to note that, to a large degree, these underpinnings also reflect Solomon-like pronouncements, albeit at an earlier phase of decision. The bottom line is that we are more than ever convinced that valuation cases should be disposed of by the parties by way of settlement or other procedures short of court proceedings. [*Symington v. Commissioner*, 87 T.C. 892, 904-905 (1986).]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[33]"Nothing astonishes man so much as common sense and plain dealing," quoting R. W. Emerson, Essays, "Art," in Bartlett's Familiar Quotations 497 (15th ed. 1980). *Estate of Belcher v. Commissioner*, 83 T.C. 227, 240 (1984).