T.C. Memo. 2014-97

UNITED STATES TAX COURT

ESTATE OF BERNARD KESSEL, DECEASED, IRIS STEEL, EXECUTRIX,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28602-10.                 Filed May 21, 2014.

<u>Stephen J. Krass</u> and <u>Lee Alan Snow</u>, for petitioner.

<u>Rachel L. Schiffman</u>, for respondent.

MEMORANDUM OPINION

KROUPA, <u>Judge</u>: This matter is before the Court on respondent's motion

for partial summary judgment. <u>See</u> Rule 121.[1]

---

[1]All Rule references are to the Tax Court Rules of Practice and Procedure,
(continued...)

**[\*2]**  Bernard Kessel (Decedent) had a personal pension plan that invested with Bernard L. Madoff Investment Securities, LLC (Madoff Investments).  Decedent's Madoff Investments account (Madoff account) ostensibly held assets appraised at more than $4.8 million.  Decedent's estate filed a Federal estate tax return in 2007 and reported the Madoff account as a $4.8 million asset of the estate.  The estate paid the full amount of tax due on that value but subsequently filed a supplemental Federal estate tax return claiming a refund on the ground that the Madoff account had a zero value.

Respondent determined a $339,143 deficiency in the estate's Federal estate tax and denied the estate's request for a $1,937,391 refund.[2]  Respondent asks us to decide two issues.[3]  Respondent first asks us to identify the Madoff account--as opposed to the Madoff account's purported holdings--as the property subject to

---

[1](...continued)
and all section references are to the Internal Revenue Code in effect for the date of Decedent's death, unless otherwise indicated.

[2]All monetary amounts are rounded to the nearest dollar.

[3]The estate requests partial summary judgment in its favor in the last paragraph of its Objection to Respondent's Motion for Partial Summary Judgment. We do not recognize the estate's request for partial summary judgment as a motion for partial summary judgment in its favor because the estate was required to file a separate motion. See Rule 54.  In any event, the estate would not be entitled to partial summary judgment for the reasons discussed infra.

[*3] Federal estate tax. We will deny respondent's motion on this point.

Respondent next asks us to hold that a hypothetical willing buyer and willing seller of the Madoff account would not reasonably know or foresee that Mr. Madoff was operating a Ponzi scheme at the time Decedent died. We will likewise deny respondent's motion on this point.

## Background

### A. Decedent

Decedent owned Bernard Kessel, Inc. (BKI), a New York corporation. In 1982 BKI created the Bernard Kessel Inc. Pension Plan (Plan), a qualified defined benefit plan. Decedent was the sole participant in the Plan.

In 1992 the Plan became a customer of Madoff Investments when Decedent opened the Madoff account on behalf of the Plan.[4] Decedent used $610,000 of the Plan's assets to open the Madoff account.[5] The customer agreement between the Plan and Madoff Investments allowed the Plan to assign its interest in the Madoff account with Madoff Investments' prior written consent.

---

[4]The Madoff account was Madoff Investments account No. X-ZA-XXX-30/40.

[5]In 2004 Decedent withdrew $1.2 million from the Madoff account on behalf of the Plan and deposited the same amount into Madoff Investments account No. X-ZB-XXX-30/40 (Madoff account II).

**[\*4]**   Decedent designated his fiancé, Iris Steel, the primary beneficiary of 70% of the death benefits payable under the Plan.  Decedent designated his son, Richard Kessel, the primary beneficiary of 30% of the death benefits payable under the Plan.

B.  Estate Tax Return

Decedent died testate in New York on Sunday, July 16, 2006.  Decedent's Last Will and Testament appointed Ms. Steel to act as the executrix of the estate.  Ms. Steel contacted Madoff Investments to determine the value of the assets held in the Plan's accounts.  Madoff Investments sent a letter to Ms. Steel detailing the number and price of each publicly traded security, money market fund and option the Madoff account purportedly held.  Ms. Steel forwarded this correspondence to an appraisal service, which then prepared an appraisal report stating that the value of these assets was $4,811,853.[6]

Ms. Steel timely filed a Form 4768, Application for Extension of Time To File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes,

---

[6]Madoff Investments also represented that Madoff account II held assets valued at $815,301.  The estate does not challenge the date of death value of Madoff account II.

[*5] together with two checks totaling $1,570,509.[7] Ms. Steel then filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, within the time provided by the 6-month extension and reported that the estate owed $1,881,256 in Federal estate tax.[8]

The Madoff account became payable to Ms. Steel and Richard Kessel by reason of Decedent's death. After Decedent died Ms. Steel and/or Richard Kessel withdrew funds from the Madoff account seven times.[9] These withdrawals totaled more than $2.8 million.[10]

C. Mr. Madoff's Ponzi Scheme

Bernard Madoff was arrested in late 2008. The Securities and Exchange Commission (SEC) immediately issued a press release stating that it had charged Mr. Madoff with securities fraud for a multi-billion-dollar Ponzi scheme. The

[7]Ms. Steel submitted the checks to pay the estimated Federal estate tax.

[8]The estate had an unpaid $310,747 Federal estate tax balance. Respondent assessed additions to tax of $12,430 and $18,645 on this unpaid balance. The estate subsequently submitted a $367,152 payment to respondent in full satisfaction of the unpaid Federal estate tax balance, the additions to tax and the accrued interest.

[9]It is unclear from the limited record exactly who was responsible for which withdrawals.

[10]Over the same period, Ms. Steel and/or Richard Kessel also deposited $260,000 into the Madoff account.

[*6] SEC announced it was seeking emergency relief for investors, including an asset freeze and the appointment of a receiver for Madoff Investments.

The United States Attorney for the Southern District of New York (US Attorney) commenced a criminal proceeding against Mr. Madoff alleging fraud, money laundering, making false statements, perjury and theft. The US Attorney alleged, among many other things, that Mr. Madoff effected his Ponzi scheme by failing to purchase securities and invest the investors' funds as he had represented. Mr. Madoff admitted that he perpetrated his Ponzi scheme through Madoff Investments. Mr. Madoff was sentenced to 150 years in prison.

The Securities Investor Protection Corporation (SIPC) filed an application for a protective decree, seeking liquidation of Madoff Investments. Irving Picard was appointed the trustee (Madoff trustee) for Madoff Investments investors and the creditors of the Madoff Investments general estate.[11]

The Plan tried to recover the assets reportedly held in the Madoff account. The Plan sought to recover $3,221,057 in securities positions reflected on the

---

[11]The Madoff trustee classifies investors whose withdrawals exceeded their deposits as "net winners" and investors whose deposits exceed their withdrawals as "net losers." The Madoff trustee's first mandate was to make whole the "net losers." Investors considered "net winners" have a general creditor claim against the Madoff Investments general estate for fraud. These "net winners" are eligible for distribution from the bankruptcy estate once the higher priority claims of the "net losers" are satisfied.

[*7] Madoff account statement for the month immediately before Mr. Madoff's arrest. The Madoff trustee denied the Plan's claim because Madoff Investments had not actually purchased securities for the Madoff account and the account had a positive net equity of $2,721,337.[12] [13]

D. Deficiency Notice and Petition

After the Madoff trustee denied the claim, the estate submitted a Form 843, Claim for Refund and Request for Abatement, requesting a $1,937,391 refund. The estate also submitted a supplemental Form 706, which reported the date of death value of the investment account as zero.[14]

Respondent denied the estate's request for refund and determined the value of Decedent's taxable estate was greater than the estate had reported. The estate timely filed a petition alleging, among other things, that the fair market value of

---

[12]The $5,523,932 withdrawn from the investment account was greater than the $2,802,595 deposited into the Madoff account. In other words, Decedent, Ms. Steel and/or Richard Kessel collectively withdrew $2,721,337 more than they had deposited into the Madoff account.

[13]The Madoff trustee has brought an adversarial proceeding against the estate, Ms. Steel, the Plan and the Plan's trustee to set aside certain transfers with respect to the Madoff account (clawback action). The clawback action seeks to recover the payments of fictitious profits because the assets recovered so far by the Madoff trustee are insufficient to reimburse all Madoff Investments investors.

[14]The estate did not change the date of death value of Madoff account II.

[*8] the Madoff account was zero rather than $4.8 million, as the estate had reported, when Decedent died. Respondent filed a motion for partial summary judgment.[15]

## Discussion

This matter comes before us in the wake of misfortune wrought by Mr. Madoff's Ponzi scheme. In essence, we must decide the regrettable question of whether the estate must pay Federal estate tax for Decedent's owning the Madoff account, which did not actually hold the assets it had purported to. We first address our standard for granting summary judgment. We then find that there are material facts in dispute as to whether the Madoff account is the property to be valued for Federal estate tax and as to whether a hypothetical willing buyer and willing seller of the Madoff account would reasonably know of or foresee Mr. Madoff's Ponzi scheme at the time Decedent died.

## I. Summary Judgment

We begin with our summary judgment standard. Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. See, e.g., FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). We will

___

[15]The parties have agreed to file a partial stipulation of settled issues except for the refund denial claim concerning the date of death fair market value of the Madoff account.

**[\*9]** grant a motion for summary judgment only if it is shown that there is no genuine dispute as to any material fact and that we may render a decision as a matter of law.  See Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).  The moving party bears the burden of proving that there is no genuine dispute as to any material fact, and we view all factual materials and inferences in the light most favorable to the nonmoving party.  Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).

## II.  Identity of the Property To Be Valued

We now address respondent's argument that the Madoff account existed on the date Decedent died and that it--rather than its purported holdings--must be the property valued for Federal estate tax purposes.

We agree with the first leg of respondent's argument--that the Madoff account existed on the date Decedent died.  The Court of Appeals for the State of New York has held that the eventual discovery of Mr. Madoff's Ponzi scheme did not dissolve a Madoff Investments account before Mr. Madoff's Ponzi scheme began to unravel.  Simkin v. Blank, 968 N.E.2d 459, 464 (N.Y. 2012).  This Court must follow a decision by a State's highest court concerning an issue of that State's law because the State's highest court is the best authority on its own law.

**[*10]** <u>See</u> <u>Commissioner v. Estate of Bosch</u>, 387 U.S. 456, 465 (1967).  The Court of Appeals for the State of New York is New York's highest court.

We disagree, however, with the second leg of respondent's argument--that the Madoff account must be <u>the</u> property valued for Federal estate tax purposes. We begin with the relevant statutes and regulations.  The Federal estate tax is imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States.  Sec. 2001(a).  The value of a taxable estate is a function of the value of a decedent's gross estate.  Sec. 2051.  A decedent's gross estate includes all property to the extent of the decedent's interest in the property at the time the decedent died.  Sec. 2033.  A decedent's gross estate may include real property, tangible personal property and/or intangible personal property.  Sec. 20.2033-1(a), Estate Tax Regs.  The value of every item of property includible in a decedent's gross estate is generally its fair market value at the time the decedent died.  <u>Id.</u> sec. 20.2031-1(b).

The creation of legal interests in property is generally governed by State law, while Federal law determines what interests so created shall be taxed.  <u>Estate of Gamble v. Commissioner</u>, 69 T.C. 942, 948 (1978).  Personal property under New York law includes everything that may be owned, except real property.  N.Y. Gen. Constr. Law sec. 39 (McKinney 2003).  Certainly, the owner of the Madoff

**[\*11]** account had what appear to be property-like rights in his agreement with Madoff Investments concerning the Madoff account; e.g., he had the restricted right to transfer the account. We cannot say on the record before us, however, whether that agreement constituted a property interest includible in Decedent's gross estate separate from, or exclusive of, any interest Decedent had in what purported to be the assets held in the Madoff account. This question is best answered after the parties have had the opportunity to develop the relevant facts at trial. We will therefore deny respondent's motion on this point.

III. Value of the Property for Federal Estate Tax Purposes

We now turn to respondent's second argument--that a hypothetical willing buyer and willing seller of the Madoff account would not reasonably know or foresee that Mr. Madoff was operating a Ponzi scheme at the time Decedent died.

We begin with our standard for valuing property includible in the gross estate to provide context to respondent's argument. The Federal estate tax is imposed on the transfer of property rather than on the receipt of property. Ithaca Trust Co. v. United States, 279 U.S. 151 (1929). Therefore, the value of the property to be taxed must be determined as of the time the property is transferred. Id.

**[\*12]** Value in this context is defined as fair market value--what a willing buyer would pay to a willing seller, both having reasonable knowledge of the relevant facts. Sec. 20.2031-1(b), Estate Tax Regs. Accordingly, later occurring events affecting the value of the property transferred are relevant to the determination of fair market value only if they were reasonably foreseeable at the time of transfer. Estate of Gilford v. Commissioner, 88 T.C. 38, 52-54 (1987). But later occurring events not affecting value may be relevant to the determination of fair market value regardless of their foreseeability at the time of transfer. Estate of Jung v. Commissioner, 101 T.C. 412, 431 (1993).

Respondent argues that a Ponzi scheme, by its very nature, is not reasonably knowable or foreseeable until it is discovered or it collapses. Respondent notes Mr. Madoff's particular skill and that his Ponzi scheme was not disclosed until it collapsed in December 2008. Respondent then reasons that Mr. Madoff's Ponzi scheme was knowable or foreseeable only at the point when it collapsed--when the amount of money flowing out of Madoff Investments was greater than the amount flowing in. For purposes of this motion, at least, we disagree.

Some people had suspected years before Mr. Madoff's arrest that Madoff Investments' record of consistently high returns was simply too good to be true. See, e.g., Comm. on Fin. Servs., 111th Cong., Meeting on Assessing the Madoff

**[*13]** Ponzi Scheme and the Need for Regulatory Reform 48-49 (Comm. Print 2009); Oversight of Securities and Exchange Commission's Failure to Identify the Bernard L. Madoff Ponzi Scheme & How to Improve SEC Performance:  Hearing Before the Comm. on Banking, Hous., & Urban Affairs, 111th Cong. 2-3 (2009). Whether a hypothetical willing buyer and willing seller would have access to this information and to what degree this information would affect the fair market value of the Madoff account or the assets purportedly held in the Madoff account on the date Decedent died are disputed material facts.  See Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. at 238.  Thus, we will deny respondent's motion on this point as well.

IV.  Conclusion

We will deny respondent's motion.

In reaching these holdings, we have considered all of the parties' arguments, and, to the extent not addressed, we conclude that they are moot, irrelevant or without merit.

To reflect the foregoing,

An appropriate order will be issued denying respondent's motion.