MELVIN AND MARGARET SALWASSER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SALWASSER MANUFACTURING CO., INC, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Salwasser v. Commissioner
Docket Nos. 26817-89, 26818-89
United States Tax Court
T.C. Memo 1991-466; 1991 Tax Ct. Memo LEXIS 515; 62 T.C.M. (CCH) 799; T.C.M. (RIA) 91466; September 24, 1991, Filed *515 Decisions will be entered in each docket for the petitioners. John J. McGregor, for the petitioners. Steven J. Sibley, for the respondent. BUCKLEY, Special Trial Judge. BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION These consolidated cases were heard pursuant to the provisions of section 7443A(b) and Rule 180 et seq. [1]
Respondent determined a deficiency in petitioners Melvin and Margaret Salwasser's (sometimes hereafter "the Salwassers") 1986 Federal income tax in the amount of $ 9,366. Respondent determined a deficiency in petitioner Salwasser Manufacturing Co., Inc.'s (sometimes hereafter "the company"), September 30, 1986, Federal corporate income tax in the amount of $ 9,200. The issue to be determined in each consolidated case is the deductibility of contributions made during the respective years at issue to The National Endowment *516 for the Preservation of Liberty (NEPL). FINDINGS OF FACT Some of the facts are stipulated and they are so found. Petitioners Melvin and Margaret Salwasser are husband and wife who filed joint returns for 1986. When they timely filed their petition herein they resided at Reedley, California. Petitioner Salwasser Manufacturing Co., Inc., had its principal place of business in Reedley, California, at the time its petition was filed herein. Melvin Salwasser is, and was at all relevant times, the Chief Executive Officer and President of Salwasser Manufacturing Co., Inc., a company which manufactures packaging machinery. The Salwassers owned over 50 percent of the company's stock in 1986, and Melvin Salwasser controlled company decisions on donations to various groups and organizations during 1985 and 1986. Mr. Salwasser was the petitioner involved in the facts set forth below, and references to petitioner in the singular refer to Mr. Salwasser. Petitioner Melvin Salwasser was graduated from Fresno Technical High School and promptly went to work in his father's small manufacturing concern, Salwasser Manufacturing. At the time of trial, the company had grown substantially and had *517 over 200 employees. Petitioner has not had any particular training in either accounting or taxation. He is a successful businessperson who is held in high esteem in his community. During 1986 the Salwassers made and claimed contributions to the National Endowment for the Preservation of Liberty, NEPL, in the amount of $ 20,410. The company, during its year ended September 30, 1986, made and claimed contributions of $ 22,000 to NEPL. There is no substantiation question about the amounts in controversy. Respondent disallowed in full these claimed charitable contributions. Respondent's reasons for determining the contributions nondeductible, as stated in the deficiency notices sent to petitioners, were that the funds were contributed in order to provide lethal aid and lethal equipment to the Nicaraguan Freedom Fighters, and, alternatively, that the contributions were made for political/legislative purposes and to a foreign country/group. Respondent abandoned his position that the funds were for a foreign country or group on brief, and we accordingly do not deal with that issue. The Salwassers made the following contributions to NEPL: September 8, 1985
$ 1,000
November 1, 1985
5,000
September 15, 1986
20,000
October 14, 1986
410
*518 In addition, they made contributions to various other groups associated in some unspecified manner with Mr. Channell, president of NEPL as follows: May 8, 1986 - Anti-Terrorism American Committee
$ 1,000
October 27, 1986 - American Conservative Trust
2,000
October 31, 1986 - American Conservative Trust
3,000
Salwasser Manufacturing Co., Inc., made the following contributions to NEPL: August 28, 1985
$   500
April 14, 1986
20,000
August 12, 1986
2,000
National Endowment for the Preservation of Liberty. NEPL, during the years 1984 through 1986, had its principal office located in Washington, D.C. Its president was Carl Channell, and one of its employees was Krishna Littledale (sometimes referred to as Kris Littledale). NEPL applied for, and was granted, conditional exempt status under section 501(c)(3) by the Internal Revenue Service on December 12, 1984. The ruling letter stated, inter alia: Based on information supplied, and assuming your operations will be as stated in your application for recognition of exemption, we have determined you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Because you are a *519 newly created organization, we are not now making a final determination of your foundation status under section 509(a) of the Code. However, we have determined that you can reasonably be expected to be a publicly supported organization described in sections 509(a)(1) and 170(b)(1)(a)(vi). * * * Also, a grantor or donor may not rely on this determination if he or she was in part responsible for, or was aware of, the act or failure to act that resulted in your loss of section 501(c)(3) exempt status * * *.
The conditional exemption granted NEPL was revoked by the Internal Revenue Service by letter dated April 30, 1987. That letter stated in part: On April 29, 1987, the Independent Counsel filed a Criminal Information with the United States District Court for the District of Columbia. On the same date Carl R. Channell, president of your organization, plead guilty to this Criminal Information. This plea is an admission to the facts and all charges contained in the Criminal Information. In addition, on the basis of our review of your activities and financial records, we conclude that you are not operated exclusively for purposes described in section 501(c)(3) of the Code. *520 You have made substantial expenditures for nonexempt purposes, you have engaged in prohibited political campaign activities, engaged in substantial legislative activities, operated for private purposes, and permitted your net earnings to inure to the benefit of those in control of your operations. Further, you have failed to file your annual return, Form 990, for the year ending December 31, 1984, and have not supplied requested information as required by section 6033 of the Internal Revenue Code. On the basis of these matters, I am hereby revoking the letter of December 12, 1984, referred to above, effective May 25, 1984, your date of incorporation. * * *
Other than the statements contained in respondent's revocation letter, the record contains no information or specifics regarding alleged acts of NEPL which brought about the revocation letter. The record contains no information as to the actual use by NEPL of any funds contributed to it by petitioners, or indeed, anyone else. The record is silent as to whether any actions were brought in any court in regard to the exemption revocation, and we have not located any case regarding the exemption revocation. Criminal Information *521 filed against Mr. Channell. Mr. Channell was charged with criminal conspiracy under 18 U.S.C. section 371. The stated objects of the conspiracy were (1) "to defraud the IRS and deprive the Treasury of the United States of revenue to which it was entitled by subverting and corrupting the lawful purposes and operations of NEPL by using NEPL for an improper purpose, namely, to solicit contributions to purchase military and other types of non-humanitarian aid for the Contras" and (2) "to defraud the IRS and deprive the Treasury of the United States of revenue to which it was entitled by falsely representing that contributions made to NEPL were tax-deductible when, in truth and in fact, certain of such contributions were not deductible since they were made for a non-deductible purpose, namely, to purchase military and other types of non-humanitarian aid for the Contras." The Criminal Information was filed by the Special Counsel on April 29, 1987, and on the same date Mr. Channell entered a guilty plea. Relationship between petitioners and NEPL. Petitioner Melvin Salwasser was first introduced to NEPL by a letter from that organization to him dated July 9, 1985. That letter stated *522 that NEPL planned a series of 30-second television messages aimed at persons under 40, called "Freedom Spots" throughout America. The goal stated was: to teach our citizens that Americans have sacrificed selflessly. That we have given generously. That we have fought courageously. That we have brought freedom, peace, security, and prosperity to much of the world. That we have brought these gifts to a world incapable of saving itself.
This letter was signed by the president of NEPL, Carl Channell (sometimes referred to as "Spitz" Channell). As of the date of trial herein, Mr. Channell was deceased. Mr. Salwasser was a member of several organizations that are generally categorized as "conservative" in nature and he was accustomed to receiving a substantial number of letters and requests for funds from those groups as well as other organizations. He was very concerned about communism, and in particular, about communism close to the shores of the United States. Petitioner believed during 1985 and 1986 that the Soviet Union was providing assistance to the Sandinista government of Nicaragua, and he was concerned about the impact of such assistance upon the United States. *523 Further, petitioner believed that a successful overthrow of the Sandinistas by the Contras or Freedom Fighters, an insurgent army from time to time in armed conflict with the Sandinistas, would lead to a more democratic form of government in Nicaragua. Armed activities by the Contras were going on during both 1985 and 1986. During 1985, the Salwassers contributed $ 6,000 to NEPL and the company contributed $ 500. The deductibility of these amounts is not in question in these cases. These contributions were made on the following dates: $ 500 on August 28, 1985, from the company; and $ 1,000 on September 8, 1985, from the Salwassers who also gave $ 5,000 on November 1, 1985. After making the first contribution by the company, petitioner received at least one telephone call from Kris Littledale on behalf of NEPL. That call (or calls) concerned the July 9, 1985, NEPL request for funds and also concerned an invitation petitioner was soon to receive. Subsequently, by cable dated November 6, 1985, petitioner Melvin Salwasser was invited to attend a Central American Freedom program, sponsored by NEPL, which was to include a White House special select briefing on presidential policy *524 goals toward Nicaragua and Central America in general. In addition, Adolfo Calero, a leader of a Contra Group, was to be present. Petitioners did not attend this meeting. The next day, a letter was written to Mr. Salwasser by Littledale on behalf of NEPL, thanking him for his support for the Freedom Fighters in Nicaragua. Petitioner also received, under date of December 17, 1985, a letter from Oliver L. North, Deputy Director, Political Military Affairs, National Security Council of the United States, stating as follows: In supporting the President's policy on Nicaragua, the National Endowment for the Preservation of Liberty does all Americans a great service. Your support of their efforts and the cause of freedom in Nicaragua will bring success in the struggle for democracy throughout Central America. Freedom is worth sacrificing for and young men and women do so everyday in Nicaragua. We salute you for your sacrifices to help achieve democracy. May God bless you.
Sometime during February of 1986, while petitioner Mr. Salwasser was in Lancaster, Pa., on company business, Mr. Littledale traveled from Washington, D.C., to visit him there. Thereafter, on April 14, *525 1986, the company made a contribution of $ 20,000 to NEPL. The cover letter stated "we enclose our check for the assistance to preserve freedom in our western hemisphere." Shortly thereafter, Mr. Salwasser received another letter from Lt. Col. North, this one dated May 2, 1986, thanking him for his support "to help assure a victory for freedom in Central America." The United States House of Representatives approved on June 25, 1986, $ 70,000,000 in military aid and $ 30,000,000 in nonmilitary aid to the Nicaraguan contras. Both Mr. Channell, President of NEPL, and Mr. Littledale wrote Mr. Salwasser thanking him for his assistance and support. He also heard further in the same vein from Lt. Col. North on July 23, 1986. On August 12, 1986, the company made an additional contribution to NEPL in the amount of $ 2,000, and on September 15, 1986, the Salwassers also contributed $ 20,000. Later, on October 14, 1986, they contributed $ 410. The $ 410 contribution was in response to a request for funds from Littledale to print pamphlets to counter a pro-Sandinista meeting which was going on in Washington, D.C. The common theme running throughout the letters from Mr. Channell and Mr. *526 Littledale of NEPL and Lt. Col. North of the National Security Council was that petitioners' contributions were in direct support of President Reagan's desires regarding the Freedom Fighters of Nicaragua. Mr. Salwasser believed that he was helping publicize the situation regarding the Contras in support of the President of the United States. He believed that he was helping mold public opinion in support of the President's program through contributions to NEPL. His belief was sincere and reasonable. He and one of his sons, along with Littledale and Channell, met with Lt. Col. North in his office at the Old Executive Office Building in September of 1986, at which time Lt. Col. North briefed him on the situation regarding the Contras, both as a matter of their military needs and as a matter of their needs for food, clothing, and other humanitarian aid. Lt. Col. North, at this briefing, specifically discussed the need to repair a supply airplane for use by the Contras. Lt. Col. North did not make any direct request to petitioners for contributions to NEPL. However, following the meeting, petitioner and his son went to breakfast with Channell and Littledale, at which time petitioner *527 was specifically requested to supply additional funds. The $ 20,000 contribution by petitioner was in response to the meetings with Lt. Col. North, Channell, and Littledale. NEPL, through Channell and Littledale, gave potential contributors the impression that NEPL was working directly with the White House, and it is at the least clear that they were working closely with Lt. Col. North of the National Security Council. Mr. Littledale had the impression that North could provide assistance, direct or indirect, to the Contras. In the various conversations and meetings between Mr. Salwasser and Littledale and Channell, as well as during the meeting with Lt. Col. North, there were discussions regarding the need by the Contras for military aid in the nature of food and clothing, as well as for weaponry. Littledale did suggest to contributors and potential contributors that NEPL had the ability to provide assistance of some sort to the Contras; Littledale was of the impression that Lt. Col. North could provide such assistance, directly or otherwise, to the Contras although he had no information as to the means utilized by North. NEPL and Lt. Col. North worked together closely, with *528 North providing information to NEPL, and giving briefings for potential contributors of NEPL. Further, NEPL was in direct contact with leaders of the Contras, who often appeared at various NEPL fund raisers during 1986. Further, Littledale made certain that contributors and potential contributors were aware of these facts. It was clear that NEPL was in favor of providing both military and nonmilitary assistance to the Contras. Mr. Salwasser agreed with these goals of NEPL. Mr. Littledale discussed with Mr. Salwasser all of the needs of the Contras, food and clothing as well as weaponry. Among weapons discussed were missiles. Mr. Littledale gave Mr. Salwasser the impression that a contribution to NEPL would be used to help the Contras against the Sandinista government. Mr. Salwasser was very concerned about the Soviet buildup in Nicaragua, and he felt the Contras were fighting communist influence there. In addition to the contributions previously discussed, the Salwassers also made contributions to the American Conservative Trust totaling $ 5,000 in 1986, as well as to the Anti-Terrorism American Committee in the amount of $ 1,000. These two groups, along with one entitled *529 Sentinel, had some unstated connection with NEPL, and contacts with petitioners on their behalf were made by Littledale. Petitioners were advised that the contributions to the American Conservative Trust were to be used to attempt to defeat liberal congressmen and to help conservative political candidates; they were also advised that the contribution to the Anti-Terrorism American Committee would not be tax deductible as it was to be used for political purposes. Petitioners did not attempt to deduct the amounts contributed to these groups on their returns. The Sentinel group was set up for lobbying purposes. Petitioners made no contributions to Sentinel. It was not unusual for petitioners to make contributions to organizations where the contributions were not deductible. Petitioners kept meticulous records and fully advised their accountant who prepared the returns of the information they had in regard to any contributions. In some instances, the accountant requested that petitioners obtain copies of the tax exemption letters. In the case of NEPL, petitioners provided their accountant with a copy of the exemption letter which had been sent to them shortly after they made their *530 first contribution in 1985. When petitioners made the 1985 and 1986 contributions, they did not know that NEPL was being investigated by the Internal Revenue Service (if in fact it was being investigated), and the record is silent as to when such an investigation may have commenced. The record contains no information as to the exact use by NEPL of any of petitioners' contributions. The parties have stipulated that none of the petitioners has knowledge of the use by NEPL of funds contributed by them. Mr. Salwasser is of the impression that the original 1985 contributions were used for the television programs outlined in NEPL's introductory letter. It also appears clear that the $ 410 contributed by the Salwassers in 1986 went to print pamphlets that were distributed outside a meeting in Washington, D.C., of a pro-Sandinista group. Petitioners believed the amounts they gave NEPL were for humanitarian assistance to the Contras. It was the position of President Reagan, and eventually the Congress of the United States, that this country should provide some support for the Contras. Thus, in the latter half of 1986 Congress provided for both military and nonmilitary aid for the Contras. *531 On the bottom of one letter sent on NEPL letterhead by Spitz Channell to President Reagan, petitioner's name, along with 11 others, was listed under a typed heading "Board of Advisors." Respondent attempts to make much of this. However, petitioners were not advisors to NEPL. Petitioners' relationship with NEPL was no more than that of contributors. Petitioner did not advise NEPL, the organization did not report to him other than in broad generalities, and he had no control over the organization. He was not an officer or director of NEPL. We consider the use of petitioner's name, along with those of others, no more than mere puffery on the part of NEPL so that its contributors might see their names on an NEPL letter to the President. We further note that the inscription in question did not appear on any other NEPL letterhead communications in the record. ULTIMATE FINDINGS OF FACT Petitioners' contributions to NEPL were not made with knowledge that NEPL operated for nonexempt purposes. OPINION Respondent's position, as stated at trial and on brief, was that petitioners had knowledge that the contributions made to NEPL were used for purposes other than exempt, and that accordingly *532 such contributions were not deductible under section 170. Respondent argues that if petitioners had such knowledge, the revocation of the exemption would be retroactive as to them and would serve to deny them the right to deduct their contributions to NEPL. Respondent went even further at trial, taking the position that if petitioners believed that the funds were to be used for nonexempt purposes, whether or not they were actually so used, petitioners were not entitled to deductions for the contributions. Petitioners, on the other hand, argue that they did not know or even suspect that NEPL was not exempt until after their contributions to it were made, and that they reasonably relied upon the exemption letter issued by respondent. They go on to argue that they believed they were making contributions for humanitarian aid to the Contras, and that they believed such aid to be within the exemption letter issued by respondent. They argue, alternatively on brief, that if this Court holds that petitioners did have knowledge that NEPL was not exempt, their contributions to NEPL should be deductible under section 170(c)(1) as contributions made for the use of the United States. Respondent *533 contends that this alternative argument represents new matter brought up after trial and that it should not be considered. We agree with respondent in this regard. We commence this opinion with the basic premise that petitioners bear the burden of proving respondent's determinations disallowing the contributions to be incorrect. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). We hold that, although the question is close, they have met their burden. Section 170(a) allows a deduction, subject to certain limitations not here relevant, for any charitable contribution made during the taxable year. A "charitable contribution" is defined to mean a contribution or gift to or for the use of, among others, the United States (section 170(c)(1)) or to a corporation, trust, fund, or foundation organized and operated exclusively for charitable or educational purposes, no part of the net earnings of which inures to the benefit of any private individual, which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements) any *534 political campaign on behalf of (or in opposition to) any candidate for public office. Sec. 170(c)(2). Section 1.170A-1(h)(5), Income Tax Regs., provides that no deduction shall be allowed for amounts paid to an organization which is disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation or is engaging in political activities. Section 1.170A-1(h)(6), Income Tax Regs., further provides that no deduction shall be allowed for expenditures for lobbying purposes, to wit, the promotion or defeat of legislation. Where an exemption letter has been revoked, section 1.170A-9(e)(5)(iii)(c), Income Tax Regs., provides that the status of contributions will not be affected until notice of change of status is made to the public. We hold that petitioners had no knowledge of the change of status of NEPL during the making of any of the contributions in question. The regulations go on to provide, however, that notice of change of status is not necessary, "if the grantor or contributor was responsible for, or aware of, the act or failure to act that resulted in the organization's loss of classification under section 170(b)(1)(A)(vi) or acquired knowledge *535 that the Internal Revenue Service had given notice to such organization that it would be deleted from such classification. Sec. 1.170A-9(e)(5)(iii)(c), Income Tax Regs. Petitioners did not acquire any such knowledge prior to the filing date of their returns. We now consider whether petitioners knew, or had reason to know, that NEPL was engaged in the activities which led to the loss of its exempt status. The paucity of the record causes us difficulty in this regard since the only record references to the reasons for which respondent revoked NEPL's exempt status are those set forth in conclusory terms in the revocation letter. Respondent, who is the party in control of information about specific activities of NEPL which resulted in the exemption revocation, has not chosen to enlighten the Court in regard to any specifics whatsoever. The record contains no information regarding specific acts or nonacts which led to the revocation. While we will deal with the conclusory statements in the revocation letter, we first consider once again the question of the burden of proof. As stated earlier, the burden of proof is upon petitioners to prove that respondent's determinations are incorrect. *536 Rule 142(a). The venue for appeal in this matter lies with the Ninth Circuit Court of Appeals. That Circuit, in Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court, discussed and contrasted the burden of proof under our Rules with the initial burden placed upon a taxpayer to produce enough evidence to rebut the presumption of correctness which attaches to the Commissioner's deficiency determination. We stated in Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987), that the presumption of correctness attached to the deficiency determination is a procedural device which requires a taxpayer to come forward with enough evidence to support a finding contrary to the determination. See Fed. R. Evid. 301. The burden of proof which is borne by petitioners here is a burden of persuasion, requiring petitioners to demonstrate the merits of their claim by at least a preponderance of the evidence. There are thus two obligations placed upon petitioners: First, the burden of going forward, and second, the burden of persuasion. We hold that petitioners have produced sufficient evidence to rebut respondent's presumption of correctness. *537 They have shown that the organization to which they made the contributions was ruled exempt by respondent; their credible testimony makes it clear that they believed the use to which their contributions were to be put was for exempt purposes and in furtherance of the goals of the executive branch of our government. At the time petitioners made the two $ 20,000 contributions the legislative branch of government had also voted additional aid to the Contras, including military aid. Respondent, on the other hand, has failed to produce any credible evidence [2] to show that petitioners were involved in any acts which led to the exemption revocation or that they had knowledge of such acts. Indeed, respondent has failed to provide specific information as to any precise acts by NEPL which caused respondent to revoke the exemption. Such information is singularly within the control of respondent and his failure to present it leaves petitioners with the practical difficulties inherent in refuting their involvement in unstated and unknown acts. Nevertheless, petitioners still bear the ultimate burden of showing the merits of their claims by at least a preponderance of the evidence. Accordingly, *538 we consider seriatim the conclusory reasons stated in respondent's revocation of the exemption letter and our view as to petitioners' involvement therein. *539 1. Channell's guilty plea to the Criminal Information filed by the Special Counsel. Neither party saw fit to place into evidence the Criminal Information as to which Mr. Channell pleaded guilty. The Criminal Information is, however, a public document, and we take judicial notice of its contents. Fed. R. Evid. 201. Petitioners did not conspire with Mr. Channell: they believed that their contributions were being used for tax-exempt purposes, although it is stipulated that they have no idea as to the actual use of any of their contributions by NEPL. 2. Inurement of earnings. The record contains no information to connect petitioners either with inurement of net earnings or knowledge of such inurement. Rather, we have petitioner's testimony, which we believe, that he received nothing of value from NEPL and had no information regarding self-inurement of any other person. 3. Political activities. In regard to political campaign activities, petitioner has acknowledged that he made a contribution, which he did not deduct, to the Anti-Terrorism American Committee upon a request from Kris Littledale. The purpose of the contribution was for unspecified political purposes, *540 and petitioners were specifically advised that contributions to that organization were not deductible. They also contributed $ 5,000 in 1986 to the American Conservative Trust upon a request by Littledale that they send funds to help defeat a particular group of congressmen and to help another group of candidates. These organizations, as far as petitioners knew, were separate and apart from NEPL. There is nothing in the record to indicate the contrary. The mere fact that the same players, Channell and Littledale, were involved in all these various groups does not suffice to place petitioners on notice that NEPL was engaging in political activities. The record in this case contains no information or even an inference to indicate that petitioners knew or ought to have known that NEPL engaged in political activities, and we hold that petitioners neither had nor should have had such knowledge insofar as NEPL was concerned. 4. Substantial legislative activities. The organization which had some sort of connection with NEPL and which did lobbying was called Sentinel. Petitioners made no contributions to Sentinel. We consider below whether NEPL engaged directly in such activities. *541 However, we point out that the critical test, insofar as petitioners are concerned, is whether they knew NEPL was engaged, if it was, in lobbying or political activities. The existence of the Anti-Terrorist American Committee, the American Conservative Trust, and Sentinel, all known by name to petitioner and their purposes known to petitioner, would lead petitioner not to believe that NEPL was so engaged, and we so hold that this was his belief. Respondent appears to rely principally in this regard upon the fact that the same persons, Channell and Littledale, were involved in these activities. We need not decide whether the above-named groups were separate and apart from NEPL. The critical issue is what petitioner knew. Petitioner was led to believe they were separate organizations and he knew that he was making nondeductible contributions, and he did not in fact attempt to deduct such contributions. 5. Nonexempt activities. Respondent has not delineated just what he meant in his revocation notice about nonexempt activities. We consider, arguendo, that he meant the use of NEPL funds for nonhumanitarian purposes, or as stated in the deficiency notices "lethal aid" and *542 "lethal equipment." Littledale was in frequent contact with petitioner, possibly as much as twice a month, during all of 1986. NEPL also sent numerous letters, wires, and copies of letters to petitioner regarding the Contras and their needs, both military and otherwise. They also sent information to petitioner regarding the status of legislative assistance for the Contras. Petitioner was interested in the Contras prevailing in Nicaragua. When petitioner spoke to Mr. Littledale, they discussed all the needs of the Contras, for food, clothing, and shelter as well as for weaponry. In petitioner's last conversation with Lt. Col. North, he was advised that there was an urgent need to repair a supply airplane to carry food and clothing to the Contras in the field. Even though Congress had authorized aid to the Contras, it was believed that the flow of aid would not commence soon enough to get necessary food and clothing to them without the supply airplane repair. Petitioner was under the impression that his 1986 contribution of $ 20,000 was to be used for this repair purpose, which he considered humanitarian in nature. He also believed that by making the contribution he was aiding *543 the executive branch of government in its policies. It was petitioner's belief that NEPL was able somehow to provide humanitarian assistance to the Contras. At about the same time, Littledale told petitioner that the Contras would acquire SAM-7 missiles from Israel. The record is silent, and petitioner had no means of acquiring the information, as to the actual use of any of the contributions made by petitioners, or indeed of the use to which NEPL put any of its available funds. This record does not show a connection between the conclusions set forth by the IRS in revoking the exemption and petitions. We have found no prior precedent for the issue at bar. Respondent argues in a conclusory manner that the provision of lethal aid to the Contras through the aegis of NEPL in and of itself falls outside the purposes of section 501(c)(3)[3] and the exemption which the Internal Revenue Service granted NEPL. Were we considering the propriety of respondent's retroactive revocation of the NEPL exemption, it would be necessary for us to consider this issue fully. However, that is not our aim here. The exemption revocation is a fait accompli, and our duty is to consider whether petitioners *544 had any knowledge of nonexempt activities on the part of NEPL. We consider this to be a question of fact, and viewing the record as a whole, although the matter is far from doubt, hold that petitioners did not engage in any nonexempt activities with NEPL, nor did they have knowledge of any activities of NEPL which were nonexempt in nature. Accordingly, we hold that the contributions in question are deductible to petitioners. Decisions will be entered in each docket for the petitioners. Footnotes
1. All section numbers refer to the Internal Revenue Code for the taxable years at issue; all Rule references refer to the Tax Court Rules of Practice and Procedure.↩
2. Respondent's only evidence which might indicate that petitioners thought they were buying missiles for use by the Contras is contained in excerpts of a deposition given by Mr. Littledale on September 8, 1987, to counsel for the House Select Committee to Investigate Covert Arms Transactions with Iran. Only 34 intermittent pages of the deposition, which consisted of at least 147 pages in total, were supplied by respondent and admitted into evidence. Respondent advised the Court that the balance of the pages were classified and not available to respondent. We give little, if any, weight to this expurgated version of the deposition since it is impossible to ascertain whether missing pages bear any qualifications upon the statements made by Mr. Littledale. Further, Mr. Littledale testified at the trial herein that he signed the deposition without reading it. He went on to state that the deposition did not refresh his recollection of the answers he gave in the deposition.↩
3. We also note that respondent has not placed into the record the application for exemption by NEPL upon which the determination letter granting NEPL exempt status was based.↩